343 P.2d 654

**L. J. CARTWRIGHT et al., Plaintiffs-Appellants,**

v.

**PUBLIC SERVICE COMPANY OF NEW MEXICO, a New Mexico Corporation, Defendant-Appellee.**

No. 6172.

Supreme Court of New Mexico.

Dec. 12, 1958.

Rehearing Denied May 14, 1959.

Dissenting Opinion on Motion for Rehearing June 1, 1959.

On Second Petition for Rehearing, Five Judge Court and Motion to Recall Mandate Denied Sept. 3, 1959.

Hannett, Hannett & Cornish, A. T. Hannett and T. G. Cornish, Albuquerque, David Chavez, Jr., Santa Fe, for appellants.

Noble & Noble, A. T. Rogers, Jr., Donald A. Martinez, Las Vegas, Keleher & McLeod, W. A. Keleher and A. H. McLeod, John B. Tittmann, Albuquerque, Watson, McIntosh & Watson, Santa Fe, for appellee.

Hilton Dickson, Jr., Atty. Gen., Frank Zinn, Santa Fe, Fred M. Standley, Atty. Gen., Frank Horan, Claud Mann and Irwin Moise, Peter E. Gallagher, Albert T. Ussery, Sp. Counsel for City of Albuquerque, Albuquerque, amici curiae.

Peter Gallagher, Albert T. Ussery, Frank B. Zinn, Atty. Gen., Charles D. Harris, Sp. Asst. Atty. Gen., Claud Mann, Irwin Moise, Albuquerque, James W. Stagner, Carlsbad, Jess D. Weir, Las Cruces, amici curiae on motion for rehearing.

SADLER, Justice.

On the 6th day of May, 1955, the plaintiff, Cartwright, joined by a large number

of other water users from the Gallinas River filed a first amended complaint in the district court of San Miguel County against Public Service Company as defendant, consisting of several causes of action wherein they set up their rights to the use of waters of said stream, which it was said the defendant was trespassing upon by appropriating such waters to its own use in derogation of their rights. Relief by way of injunction and damages was sought, as well as the appointment of a water master to administer the waters under the direction of the State Engineer, pendente lite.

During progress of the trial the plaintiffs were permitted to file a trial amendment to conform their amended complaint to the proof. In addition, the Town of Las Vegas prayed and was granted leave to intervene, which it did by filing its Answer along with that of the defendant, Public Service Company. The issues having been made up the cause came on for trial, following which and in due course, the court filed a decision containing its findings of fact and conclusions of law and entered its judgment, conformably thereto, dismissing the complaint from which this appeal is prosecuted. We know of no better way to place before the reader the facts upon which the trial court based its judgment than to set forth its decision containing them and the conclusions of law deduced therefrom. This we now do. They follow:

## "Decision of the Court.

"The Court makes the following

### "Findings of Fact.

#### "I.

"That the Intervener, The Town of Las Vegas, New Mexico, is a municipal corporation, organized and existing under and by virtue of the laws of the State of New Mexico and is located in the County of San Miguel, State of New Mexico.

#### "II.

"That Public Service Company of New Mexico is a corporation, organized and existing under and by virtue of the laws of the State of New Mexico.

#### "III.

"That in 1835, the territory within which the Intervener, The Town of Las Vegas, New Mexico, is situated, was a part of and under the sovereign jurisdiction of the Republic of Mexico

#### "IV.

"That on April 6, 1835, the Government of the Republic of Mexico, then having jurisdiction of the Territory in which The Town of Las Vegas, New Mexico, and City of Las Vegas, New Mexico, are now located, established a Mexican pueblo, known as Nuestra

Senora de Las Dolores de Las Vegas, at the site and comprising the territory now occupied by the said Town and City of Las Vegas, New Mexico.

## "V.

"That the Government of the Republic of Mexico, on April 6, 1835, made and approved a community colonization grant known as the Las Vegas Grant to the pueblo known as Nuestra Senora de Las Dolores de Las Vegas, and placed the grantees, the inhabitants of said pueblo, in juridical possession thereof.

## "VI.

"That the Gallinas River ran through, along or beside said pueblo and was the sole source of water supply for said Mexican pueblo, and its inhabitants.

## "VII.

"That the Gallinas River is now and has been, ever since the establishment of said Mexican Pueblo, predecessor of the Town of Las Vegas and the City of Las Vegas, the sole source of water supply of said Mexican Pueblo and its successors, the 'said City and Town and their inhabitants.

## "VIII.

"That the said Mexican Pueblo and its successors, the Town of Las Vegas and the City of Las Vegas, New Mexico, and their inhabitants, either through themselves or through the defendant, or its predecessors, under franchises, for the better utilization of such water rights, had and have for their source of water supply the Gallinas River and have used so much of the waters of said Gallinas River as has been necessary for their use.

## "IX.

"That the territory within which said Mexican pueblo was located became a part of and under sovereignty of the United States of America by the Treaty of Guadalupe Hidalgo executed in 1848.

## "X.

"That the Town of Las Vegas, New Mexico, and the City of Las Vegas, New Mexico, are the successors, under sovereignty of the United States of America, to the Mexican pueblo, Nuestra Senora de Las Dolores de Las Vegas.

## "XI.

"That after acquisition of said territory by the government of the United States of America, the Congress of the United States confirmed said grant made by the Republic of Mexico to said Mexican pueblo, and caused to be issued to the Town of Las Vegas, New Mexico, a patent to the said Las Vegas Grant, including the land upon which said Town and City, former-

ly said Mexican pueblo, was and is situated.

## "XII.

"That the said pueblo so established continuously existed and maintained its legal standing and was continuously recognized by the sovereign power of the Republic of Mexico up to the time of the acquisition of legal sovereignty of the territory by the United States of America and that during all of said time it was a Mexican pueblo.

## "XIII.

"That the present Town of Las Vegas, New Mexico, and the City of Las Vegas, New Mexico, are the result of the natural growth and expansion of the original Mexican pueblo known and established as Nuestra Senora de Las Dolores de Las Vegas, and are the successors of said pueblo.

## "XIV.

"That the laws of the Republic of Mexico in force at the time the pueblo of Nuestra Senora de Las Dolores de Las Vegas was established, and continuing in force to the time of the Treaty of Guadalupe Hidalgo, provided that Mexican colonization pueblos should have a prior and paramount right to the use of so much of the water of streams or rivers flowing through or along or beside such pueblos as should be necessary for the use of such pueblos and their inhabitants, and for the continued use of such pueblos, and their inhabitants by reason of increased growth and size and use.

## "XV.

"That at the time of the Treaty of Guadalupe Hidalgo and the acquisition of said territory by the United States of America, said Mexican pueblo was functioning under the laws of the Republic of Mexico and had all of the rights, powers and privileges of a Mexican colonization pueblo, including the right of the pueblo and its inhabitants to the use of the waters of the Gallinas River, prior and paramount to any and all other individual rights whatsoever to the use of said waters.

## "XVI.

"That the Pueblo, Nuestra Senora de Las Dolores de Las Vegas, and its inhabitants, by the laws of the Republic of Mexico, in force at the time of the Treaty of Guadalupe Hidalgo, had a vested prior and paramount right to the use of so much of the water of the Gallinas River as should be necessary for the pueblo and its inhabitants, including the future growth and expansion of said pueblo.

"XVII.

"That the Agua Pura Company, a corporation, was formed in 1880 and constructed its reservoirs and water distribution system and distributed water to the communities, now the Town of Las Vegas and the City of Las Vegas, under authority of a fifty year franchise granted by the Board of County Commissioners of San Miguel County, New Mexico.

"XVIII.

"That the defendant, Public Service Company of New Mexico, is the successor of said Agua Pura Company, a corporation, and New Mexico Power Company, a corporation.

"XIX.

"That at the time said franchise to distribute water to said communities was so granted by the Board of County Commissioners of San Miguel County, New Mexico, neither of said communities was incorporated and they were under the control and jurisdiction of the said Board of County Commissioners.

"XX.

"That the City of Las Vegas, New Mexico, was not a party to United States of America v. Hope Community Ditch, No. 712 Equity, in the United States District Court for the District of New Mexico, and that the decree in said cause did not adjudicate or determine any water rights of or claimed by said City of Las Vegas, New Mexico.

"XXI.

"That no answer was filed by the Intervener, The Town of Las Vegas, New Mexico, in United States of America v. Hope Community Ditch, et al., No. 712 Equity, in the United States District Court for the District of New Mexico; and that the decree in said cause did not adjudicate or determine any water rights of, or claimed by, the Intervener, The Town of Las Vegas, New Mexico.

"XXII.

"That the judgment and decree of the Court in United States of America v. Hope Community Ditch, et al., No. 712 Equity, in the District Court of the United States for the District of New Mexico, specifically did not affect any water rights or right to the use of water from the Gallinas River so specifically determined and established by said decree.

"XXIII.

"That at the time the issues were framed and stipulations made affecting the water rights of those parties specifically set out and whose water rights were determined by the specific portions of the judgments and decree in United States of America v. Hope Community Ditch, et al., No. 712

Equity, in the United States District Court for the District of New Mexico, the Agua Pura Company, a corporation, and New Mexico Power Company, a corporation, predecessors of the defendant, Public Service Company of New Mexico, a corporation, were operating under a franchise from San Miguel County, New Mexico.

"XXIV.

"That at all times material hereto, the defendant, Public Service Company of New Mexico, a corporation, has acted in diverting, storing and distributing water under and by virtue of franchises from said City and said Town of Las Vegas, New Mexico.

"XXV.

"That neither the rights of the Intervener, The Town of Las Vegas, New Mexico, nor of the City of Las Vegas, New Mexico, to the waters of the Gallinas River were litigated or determined by the judgment and decree in United States of America v. Hope Community Ditch, et al., No. 712 Equity, in the United States District Court for the District of New Mexico.

"The Court adopts the following "*Conclusions of Law.*

"I.

"That the Court has jurisdiction of the parties and of the subject matter of this action.

"II.

"That the Town of Las Vegas, New Mexico, and the City of Las Vegas, New Mexico, as successors of the Mexican pueblo, Nuestra Senora de Las Dolores de Las Vegas, have a right to divert and use so much of the waters of the Gallinas River as is necessary for their use, and that of their inhabitants, with a priority date of 1835, and prior and paramount to any rights of Plaintiffs.

"III.

"That the defendant, Public Service Company of New Mexico, is now diverting, and at all times material hereto has diverted and distributed, water to the Town of Las Vegas, New Mexico, and the City of Las Vegas, New Mexico, and their inhabitants, under and by virtue of the Pueblo Rights of the said Town and City, as successor to the Mexican pueblo, Nuestra Senora de Las Dolores de Las Vegas, with a priority date of 1835, as the agent and instrumentality of said City and Town, acting under franchises from said City and Town.

"IV.

"That the right of the Defendant, Public Service Company of New Mexico, a corporation, acting under and by virtue of its said franchises, to take and distribute to the Town of Las Vegas, New Mexico, and the City of

Las Vegas, New Mexico, and their inhabitants, so much of the water of the Gallinas River as is necessary for use by said City and Town and their inhabitants is prior and paramount to the right of Plaintiffs, or any of them, to divert and use the water of the said Gallinas River.

"V.

"That the judgment and decree in United States of America v. Hope Community Ditch, et al., No. 712 Equity, in the United States District Court for the District of New Mexico, is not res judicata as to the issue of the pueblo rights of the Town of Las Vegas, New Mexico, or the City of Las Vegas, New Mexico, nor of the right of the defendant, Public Service Company of New Mexico, to divert and utilize the water of the Gallinas River, under its franchises, to which said City and Town, and their inhabitants, have a prior right.

"VI.

"That the right of the defendant, Public Service Company of New Mexico, a corporation, acting under and by virtue of its said franchises, to take so much of the water of the Gallinas River as is necessary for the use of the City of Las Vegas, New Mexico, and the Town of Las Vegas, New Mexico, and their inhabitants, and distribute the same under its fran-chises is a complete defense to this action.

"Done at Hobbs, New Mexico, on this the 23rd day of April, A. D., 1956.

"(s)   John R. Brand
"District  Judge"

As readily may be seen from a reading of the lengthy findings and conclusions constituting the trial court's decision in above mentioned case, and as is often the case when findings so numerous form support for the judgment rendered, certain basic findings or questions usually emerge, the whole of which determine the result. So we have found to be the situation here. We may list those basic questions, as follows:

1.   Is the so called Hope decree entered in cause No. 712 heretofore pending in the United States District Court for the District of New Mexico res adjudicata as to Public Service Company and the intervenor, Town of Las Vegas, so as to make the defense of Pueblo Rights collateral attack upon the Hope decree and thus to deny to said defendant and intervenors the right to interpose said defense?

2.   Did the trial court erroneously find or hold the title of the heirs and claimants of interest under Luis Cabeza de Baca to the Las Vegas Grant to be inferior to the claims of defendant and intervenor?

3.   Are we entitled to apply the doctrine of Pueblo Rights, as known and recog-

nized in California in the State of New Mexico?

The first two of the major questions emerging on the record before us, being somewhat preliminary to the last and over-all question listed above, will be taken up and determined before we undertake a discussion whether the doctrine of Pueblo Rights should be recognized and applied in New Mexico.

Specific findings of the trial court dealing with the question whether the defendant and intervenor are barred by the Hope decree will be found in paragraphs XX to XXV of the findings and conclusion of law No. V of the decision announces the conclusion deemed properly deducible from the findings so made. In substance, said findings recite, speaking in narrative form, that the Pueblo, Nuestra Senora de Las Dolores de Las Vegas, and its inhabitants, under the laws of the Republic of Mexico in force at the time of the Treaty of Guadalupe Hidalgo, had a vested prior and paramount right to the use of so much of the water of the Gallinas River as was necessary for the Pueblo and its inhabitants, *including the future growth and expansion of said Pueblo*. Further, that the Agua Pura Company, a corporation, had been formed in 1880 and constructed its reservoir and water distribution system and distributed waters to the communities, now the Town of Las Vegas and the City of Las Vegas under authority of a fifty year franchise that had been granted it by the Board of County Commissioners of San Miguel County, New Mexico.

The findings went on to say that the defendant, Public Service Company of New Mexico is the successor of Agua Pura Company, a corporation, and New Mexico Power Company, a corporation; that at the time said franchise to distribute waters to said communities was so granted by the Board of County Commissioners of San Miguel County, New Mexico, neither of said communities was incorporated and both were under the control and jurisdiction of said Board of County Commissioners.

Further and touching the Hope case, the court found that the City of Las Vegas was not a party to that cause entitled United States of America v. Hope Community Ditch, et al., No. 712 Equity in the United States District Court for the District of New Mexico and that the decree in that cause neither adjudicated nor determined any water rights of or claim by said City of Las Vegas, New Mexico; that no answer was filed in said cause by the intervenor, the Town of Las Vegas, New Mexico, in the Hope case pending in the United States District Court, Equity cause No. 712; and that the decree therein neither adjudicated nor determined any water rights of, or claims by, the intervenor, Town of Las Vegas, New Mexico.

The court further found that the judgment and decree of the court in the Hope case *specifically* did not affect any water rights or right to the use of water from the Gallinas River, so specifically determined and established by said decree. Furthermore, touching said decree, the court found that at the time the issues were framed and stipulations made affecting the water rights of those parties specifically set out and whose water rights were determined by the specific portions of the judgment and decree in the Hope case the Agua Pura Company, a corporation, and New Mexico Power Company, a corporation, predecessors of the defendant, Public Service Company of New Mexico, a corporation, were operating under a franchise from San Miguel County, New Mexico.

There follows the court's finding that at all times material to this cause, the defendant, Public Service Company of New Mexico, a corporation, has acted in diverting, storing and distributing water under and by virtue of franchises of said City and Town of Las Vegas, New Mexico; that neither the rights of the intervenor, the Town of Las Vegas, New Mexico, nor the City of Las Vegas, New Mexico, to the waters of the Gallinas River were litigated or determined by the judgment and decree in the Hope case, pending in the United States District Court for the District of New Mexico.

It was from these findings the trial court drew its decisive conclusion touching the claim of plaintiffs that an application of the doctrine of res judicata precluded and barred defendant and the intervenor from the defense of Pueblo Rights. Conclusion No. V set out above declares, on the contrary, that the Hope decree was not res judicata as to the issue of Pueblo Rights of the Town of Las Vegas or the City of Las Vegas nor of the right of the defendant, Public Service Company of New Mexico, to divert and utilize water of the Gallinas River, under its franchises, to which said City and Town and their inhabitants, have a prior right.

Touching the issue the defendant and intervenor (appellees) first challenge the right of plaintiffs to place so much reliance on the effect of the Hope decree since the transcript in this case, as claimed by defendants, is entirely silent as to any proceedings had in the federal court. Furthermore, as pointed out by counsel for defendants, intervenor being embraced in the term, neither the decree nor any part of the record in the Hope case is formally before this Court. Notwithstanding this challenge, however, in the discussion of this question counsel for defendants in endeavoring to argue the point in proper relation to the argument of plaintiffs' counsel found it so awkward as to be quite impossible to avoid making some mention

of a transcript of some of the proceedings in the Hope case, not a part of the decree, attached as an appendix to plaintiffs' brief in chief. They (defendants) further assert:

"If appellants are to claim the federal decree as res judicata of the rights between the parties here, they must, of course, show that both appellants or their privies and appellees were parties to that action and that appellants were decreed rights superior to those of appellees. There is nothing whatever here to indicate that appellants were parties to the federal action or that they were decreed any rights whatsoever."

Immediately thereafter, counsel for defendant cite the case of Bounds v. Carner, 53 N.M. 234, 205 P.2d 216, much relied upon by plaintiffs in support of their claim that *res judicata* under the Hope decree bars any claim of Pueblo Rights on defendants' part. In the Bounds case, this Court discussed at some length the effect of the Hope decree. There, however, the decree of the federal court was introduced in evidence. Here, it was not. Insisting all the way we have no right, nor should permit the duty to be imposed on us of taking judicial notice of the vast proceedings in the Hope case in the federal court, since the proceedings were not introduced in evidence, counsel sensing, nevertheless, the possibility this Court might notice such proceedings judicially, call our attention to what we might be expected to find.

Such proceedings would show, say counsel, that the municipal corporation, the Town of Las Vegas, filed no answer or other pleading in the case and that no judgment of any kind was taken against the Town of Las Vegas, a municipal corporation. They deny that the Town of Las Vegas ever appeared generally in the Hope case by its attorney, John D. W. Veeder, or ever intended to do so, as is pointed out.

There are two legal entities known as the Town of Las Vegas: one, the Town of Las Vegas, a municipal corporation; the other, the Board of Trustees of the Town of Las Vegas, administering the Las Vegas Land Grant. The municipal corporation is, of course, likewise governed by a Board of Trustees. The Board of Trustees of the Town of Las Vegas, administering the Las Vegas Land Grant, did answer in the Hope case and the action was formally dismissed as to it.

Mention is made by plaintiffs' counsel of the fact that Town of Las Vegas was not adjudicated a water right. They do not assert or claim, however, that any adjudication was made that the Town of Las Vegas had no water right. The fact is there was no adjudication in the Hope case affecting any right of the Town of Las Vegas.

In an effort to show service on the Town of Las Vegas, a municipal corporation, plaintiffs' counsel point out in the appendix attached to their brief in chief certain proceedings from the Hope case a document headed "Subpoena in Equity" and excerpts from a complaint, which merely contains the name of the Town without any allegations regarding it. The sufficiency of the attempted service was open to serious question by reason whereof, no doubt, the plaintiffs place so much reliance on a purported voluntary appearance in the Hope case on behalf of the Town before Special Master George E. Remley at a hearing before him. On that occasion attorney John D. W. Veeder said:

"I also appear for the Town of Las Vegas, and consumers of water of the Town of Las Vegas, *in the event it becomes necessary* to appear for said parties by reason of any adjudication of the title to the water between them and the Agua Pura Company as to the water rights of the consumers of the Town of Las Vegas." (Emphasis ours.)

This is, indeed, a weak showing for an appearance by or on behalf of the Town. Counsel for defendants assert and the record lends support to their claim that the rights of the Town should not be affected. The United States and every defendant knew the Town had filed no pleading in the case and none intended the Town should. They likewise knew it was the intention the rights of the Town should not be affected. All parties knew the City was not even a party. Likewise, all parties knew and intended that no default judgment was taken against either the Town or City and knew as noted the City was not even a party. Indeed, the decree itself provided that it should not affect either the City or Town as parties not named or otherwise mentioned in the specific portion of the decree. Furthermore, it was expressly stipulated that the adjudication to New Mexico Power Company should not affect the Town or City or their inhabitants.

General finding No. 3 of the Decree in the Hope case, which we take the liberty of quoting since latter part of it appears in our opinion in the Bounds case, reads:

"That for the purpose of determining and adjudicating water rights in this decree, the respective tracts of land, the respective ditches, canals, reservoirs, pipe lines, pumping plants and other diversions and distribution works with the rights-of-way therefor and the sites thereof, together with the water rights appurtenant thereto or exercised thereon or therethrough are owned by the respective party or parties plaintiff or defendant *as hereinafter named and set out in the specific portions of this decree, but this decree shall not be construed as having*

*adjudicated, determined or affected the title to any lands or rights in any property whatsoever other than the rights to the diversion and use of water as herein determined and established.*" (Emphasis ours.)

It is quite clear Mr. Veeder did not appear in the case for the Town. He merely said he would appear if it became necessary to appear by reason of any adjudication which would affect the Town. It did not become necessary because it was stipulated that nothing should affect the Town's rights.

The federal court, in the Hope decree, by the findings we have quoted, construed its own decree, argue counsel, and specifically provided that the decree should not be construed as in any way affecting any property or right of any one, whether a party or not, unless such person or corporation was specifically named and adjudicated in the specific portion of the decree. Neither the Town nor City is named or mentioned in the decree. No default was taken against any one. And, as correctly stated by counsel "the construction placed on the decree, by the court rendering the decree, must be given effect."

Counsel for defendant and intervenor virtually sum up their position on this question, in two succinct paragraphs, as follows:

"The whole record of the proceedings in the Hope ditch case show throughout that the City and Town did not want to be bound by the decree, and that it was the intention of all parties and of the Court, that they not be bound by it.

"Certainly, it will not be denied that a water right is property or a property right. Under the construction of the Court itself, placed on its own decree, it cannot be res judicata as to the Town or City."

Without more, we must give it as our considered judgment that the appellees (defendant and intervenor) are not bound by *res judicata* under the Hope decree from pleading as a defense the doctrine of Pueblo Rights. See, 50 C.J.S. Judgments § 733, p. 224; American Brake Shoe & Foundry Co. v. Pittsburgh Rys. Co., 3 Cir., 270 F. 812; In re McMillan's Estate, 38 N.M. 347, 33 P.2d 369; Flint v. Kimbrough, 45 N.M. 342, 115 P.2d 84.

Coming next to the second major question for determination on the record, viz., was the title of plaintiffs claiming under Luis Cabeza de Baca valid and superior in point of time to that of the Pueblo, known as Nuestra Senora de Las Dolores de Las Vegas under which the defendant and intervenor claim? We could spend much of the time and space in our opinion in tracing step by step the manner in which

Juan de Dios Maes, Miguel Archuleta, Manuel Duran and Jose Antonio Casado for themselves and twenty-five others initiated the proceedings, dated March 20, 1835, before the Governor of the province in which Las Vegas Grant lay for land in which to found a colony. Such steps and proceedings were had as to result in the making of a community colonization grant to the Grant applied for, named above, on April 6, 1835, all as specifically found by the trial court in its decision filed in this cause. It will suffice for the purpose of resolving the question to say that the record furnishes ample substantial evidence sustaining the trial court's findings and we shall not burden this opinion by attempting to set out herein the various steps on which the pertinent findings rest. The record fully supports the fact that Nuestra Senora de Las Dolores de Las Vegas was in all respects established as a colonization pueblo in accordance with the laws of Mexico and juridical possession furnished the grantees.

■ Turning then to the second major question arising on the record before us, namely, a claim of priority over the grant to the rights and title of the predecessor in interest and title of the defendant and intervenor by virtue of a grant to the Heirs of Cabeza de Baca originating in a grant said to have been initiated in 1821 and subsequently, but prior to the initiation of defendants' (appellees') title. This becomes known as the claim of the Baca heirs under whom some, if not all, of the plaintiffs claim. Plaintiffs' sub-point B, under Point I, is apparently that the Heirs of Luis Cabeza de Baca filed a conflicting claim to the Las Vegas Grant. They say the Baca heirs waived their claim to confirmation of the grant from the Mexican government. The record abundantly establishes that the Congress of the United States confirmed the Las Vegas Grant as a valid Mexican grant to the Town of Las Vegas. The claim of the Town of Las Vegas was numbered 20.

Section 3 of the Act of Congress, June 21, 1860, 12 Stat. 71, provides:

> *"And be it further enacted,* That the private land claims in the Territory of New Mexico, as recommended for confirmation by the surveyor-general in his reports and abstract marked exhibit A, as communicated to Congress by the Secretary of the Interior in his letter dated the third of February eighteen hundred and sixty, and numbered from twenty to thirty-eight, both inclusive, be, and the same are hereby, confirmed."

The section of the Act of 1860 confirming the Las Vegas Grant is in the same language, except for the claim made, as that confirming the other Mexican grants by the same Act.

One has only to refer to the trial court's findings III, IV and V, which we shall not here quote again, to see specific findings of

the trial court expressly reciting establishment by the Republic of Mexico of the Las Vegas Pueblo at the site now occupied by the Town and City of Las Vegas and the placing of the grantees in juridical possession on April 6, 1835.

We dealt with a somewhat similar question in State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421, 457. It concerned validity of the Montoya Grant in the extreme southwestern portion of San Miguel County. The contention was made that Mexico had no authority to make a grant at time the Pablo Montoya grant was made. The trial court found that the Pablo Montoya grant was made by the Republic of Mexico prior to the American occupation and was confirmed by Congress and patent issued to the grantee. In the present case, the trial court by its findings 3, 4 and 5 made the same identical findings, rendering pertinent language of the court in Red River Valley case, in opinion on motion for rehearing, viz.:

"The foregoing finding judicially determined that the grant in question was made by the Republic of Mexico, not by some unauthorized person in its name. If so made, the grant will be assumed to be perfect, needing no confirmation."

Counsel for appellees aptly assert the same force should be given by us to like findings in this case having judicially determined thereby that Las Vegas Grant was made by the Republic of Mexico, not by some unauthorized person in its name, and being so made, will be assumed to be perfect, needing no confirmation.

Notwithstanding the statement in Red River Valley Company case that a grant made by the Republic of Mexico under conditions shown needs no confirmation, the Congress did confirm the Las Vegas Grant to the Town of Las Vegas, thus affording both a judicial determination by the court as well as confirmation of the Mexican title by Congress.

On the effect of such confirmation, the Supreme Court of United States in Tameling v. U. S. Freehold & Emigration Co., 93 U.S. 644, 23 L.Ed. 998, dealing with a Mexican land grant, said:

"This was a matter for the consideration of Congress and we deem ourselves concluded by the action of that body. The phraseology of the confirmatory act is, in our opinion, explicit and unequivocal."

See, also, Maese v. Herman, 183 U.S. 572, 22 S.Ct. 91, 95, 46 L.Ed. 335, where it would seem all question of the validity of the Mexican title to the Town of Las Vegas was settled. The court said:

"The decree of the governor directed the selection of a 'site for a town to be built by the inhabitants,' and the constitutional justice, in executing the de-

cree, informed those to whom he made 'the distribution' of the land 'that the water and pasture were free to all, and that the joint labor should be done by themselves without any dispute, and that the wall surrounding the town marked out should be made by them all, which being done, that they notify the justice, in order that he may mark out to each one equally the portion he is entitled to.' A town was started, and grew and attained substantial proportions at the time the confirmatory act was passed."

It is worthy of note and quite significant that in the case of Maese v. Herman, supra, the court discussed and commented on the adverse claim of the Baca heirs as shown by the report of the surveyor-general and said:

"Congress accommodated the dispute by a magnificent donation of lands to the heirs of Baca, and confirmed the original land to the town."

We think the trial court was fully justified in declining to give priority to these claims under the Baca heirs over the grant under which Town of Las Vegas claims. It is not to be overlooked, either, that not only did the court in Maese v. Herman, supra, hold that the Las Vegas Grant was a grant to the Town but that its validity as a grant by the Mexican government could not be questioned after confirmation by Congress and found as well all facts showing the Town of Las Vegas was established as a colonization pueblo by the officials of the Mexican government. Other cases attesting the correctness of the trial court's ruling on effect of confirmation, are Board of Trustees of Anton Chico Land Grant v. Brown, 33 N.M. 398, 269 P. 51; H. N. D. Land Co. v. Suazo, 44 N.M. 547, 105 P.2d 744.

This leaves for final determination of the three basic questions listed near the beginning of this opinion, viz., the question of whether the doctrine of Pueblo Rights was properly recognized and applied by the trial court in disposing of this case. It should be enough at this point in our opinion, without setting out all the facts pertinent to the question, to say the learned judge did recognize the doctrine and apply it to the facts found, thereby upholding the doctrine in its relation to the rights of the Town of Las Vegas, the City of Las Vegas and the defendant, respectively, in and to the waters of the Gallinas River under said doctrine. With some apology for repetition and to avoid redundancy, we shall do no more at this point than to refer to findings of fact Nos. 6, 7 and 8, supra, as the basic findings upon which rest the trial court's conclusions that the Pueblo Rights doctrine is applicable.

It is not surprising that a doctrine such as the Pueblo Rights arose when we consider the fact that these colonization pueblos to which the right attached were large-

ly, if indeed, not always, established before there was any settlement of the surrounding area. Thus it resulted that there had never had been any prior appropriations or use of water of the river or stream, nor any allotment of lands, by the Mexican government prior to the establishment of the Pueblo.

■ It is the claim of plaintiffs (appellants) that constitutional and statutory provisions touching the use of water is contrary to the Pueblo Rights doctrine and that it can find no place in our jurisprudence. They fail, however, to point out in what respect this is true. This Court has long recognized that we have followed the Mexican law of water rights rather than the common law. In Martinez v. Cook, 56 N.M. 343, 244 P.2d 134, 138, we said:

"Particularly, we have never followed it in connection with our waters, but, on the contrary, have followed the Mexican or civil law, and what is called the Colorado doctrine of prior appropriation and beneficial use."

We see nothing in the theory of Pueblo Rights inconsistent with the doctrine of prior appropriation and beneficial use. The Town of Las Vegas was granted a water right by the Mexican government in 1835.

It is an admitted fact that the doctrine of Pueblo Rights as we understand and all the parties argue it is well recognized in the State of California. The parties agree that the question has not been determined in the State of New Mexico, although both parties seek to gain some comfort from two New Mexico cases which mention the doctrine. They are the cases of State ex rel. Community Ditches v. Tularosa Community Ditch, 19 N.M. 352, 143 P. 207, and the case of New Mexico Products v. New Mexico Power Co., 42 N.M. 311, 77 P.2d 634. In neither case was any position taken by the Court on the doctrine. In the Tularosa Ditch case the Court merely referred to it and said the right could not be sustained under the facts of that case because Tularosa was founded long after the territory was acquired by the United States and had never been a Mexican pueblo. In the New Mexico Products Co. case, supra, we referred to the decision of the Supreme Court of the United States in United States v. City of Santa Fe, 165 U.S. 675, 17 S.Ct. 472, 41 L.Ed. 874, where it was held that Santa Fe was never established by the Spanish or Mexican government as a pueblo and therefore could not claim pueblo rights. We did not in either of the cases mentioned hold that the doctrine of Pueblo Rights was not applicable in New Mexico, but only that, under the facts before us, neither Town had such rights.

It is not to be overlooked, too, that in State v. Tularosa Community Ditch, supra, we quoted at length, seemingly with some

approval, from Kinney on Irrigation and Water Rights (2nd Ed.), pp. 995, 996, § 581, touching the origin of the Pueblo Rights doctrine, in which Kinney asserted the "Plan of Pictic" by which the doctrine was known should be observed in the foundation of any new pueblos in the territory of which New Mexico, along with California and Arizona, constituted a part. We said [19 N.M. 352, 143 P. 215]:

"At first the plan for the establishment of these pueblos was for the King of Spain, in each case by special ordinance, to provide for the foundation of the pueblo, and to set apart for the use of the pueblo and its inhabitants a certain area of land, and to prescribe in the ordinance the rights of the pueblo and its inhabitants to the use of the waters flowing to those lands. * * * And, further, it was also at this time provided by the King, by general ordinance, that thereafterward the provisions and rights granted and the general plan followed in the foundation of the pueblo of Pictic should be followed in the foundation of any new pueblos in the jurisdiction of the commanding general of the internal Provinces of the West, of which California, Arizona, New Mexico, and Texas constituted a part. * * * And this pueblo right to the use of water, or the right of all the inhabitants in common within the jurisdiction of the pueblo, was superior to the individual rights of appropriators, and also superior to the right of the riparian proprietors, through whose fields the stream ran."

As already stated, however, neither this case nor that of New Mexico Products Co. v. New Mexico Power Co. may be cited with any justification by any party to this suit as sustaining a position taken by this Court on the Pueblo Rights doctrine.

Perhaps one of the best discussions of the rationale and philosophy of the doctrine of Pueblo Rights anywhere may be found in Kinney on Irrigation and Water Rights, pp. 2591–93. We think we may be excused to quote at length from Mr. Kinney, as follows:

"Many of the cities and towns in the southwestern portion of the United States, notably in California, Arizona, New Mexico, and Texas, were originally founded as Spanish-Mexican pueblos, and, therefore, acquired certain rights to the lands set apart either by special or general ordinance promulgated, either by the King of Spain, under Spanish rule, or by the Government of Mexico, as the successor thereof. Upon the acquisition of this territory by the United States under the Treaty of Guadalupe Hidalgo, and the Gadsden Purchase, it was provided by the Acts of Congress in effect that within a certain period of time individuals and cities and towns claiming un-

der the old Spanish-Mexican land grants, or pueblo grants, might prove up their claims before the commissioners appointed under the provisions of the Acts, and upon due proof thereof an award defining the same would be made by the commissioners and thereafterward a patent would be issued from the United States to the city or town or to the individual, as the case might be. A municipality, therefore, founded upon one of these old Spanish-Mexican pueblo grants, having proven its claim, succeeded to all the rights both in the land and waters that were formerly owned by the old pueblo. And as it was held under the Spanish-Mexican law that a community right in and to waters was paramount and superior to the rights of individuals, where the same came in conflict, therefore a pueblo, as a quasi-public corporation and representing a community, acquired rights in and to the waters flowing to and through the boundaries of the pueblo, which rights were paramount and superior to the claims of individuals in and to the same waters. And hence it follows that the city or town of the United States which is the successor of one of these old pueblos, is also the successor to all the rights in and to the waters flowing to or through the pueblo lands, which rights are paramount and superior to rights of individuals. And when the right of the pueblo was prior, this is also recognized as an element giving a superior right. It therefore follows that a city succeeding to the right of a pueblo has a preference or prior right to consume the waters of a natural stream and its tributaries, even as against an upper riparian proprietor to the full extent as may be necessary for its inhabitants and for general municipal purposes.

\*    \*    \*    \*    \*    \*

"As to the extent of the right to which the municipal corporation succeeded, the California cases seem to hold that as long as the city uses the water for municipal purposes and for supplying its inhabitants, for which the right was dedicated, that such an amount of water may be used from the stream as the necessities of the case demand, *even to the use of all the water of the stream.* And, further, it is held that if the needs of the pueblo increased in the future, the right will expand to include them, and this, too, although the population of the city is not confined to its original limits. \* \*

"It therefore seems to us that title to water rights based upon the old Spanish-Mexican pueblo right, under the authorities cited and quoted in our notes, *is one of the strongest of titles that a municipality may have.* It is

not only a right absolute in itself to the extent of the water used for municipal purposes and for supplying its inhabitants with the necessary water, but under the case of Los Angeles v. Pomeroy, as the city increases in size and population, it ·is an expanding right, which is paramount and superior to the ' claims of others until the city eventually lays claim to all the water which the stream supplies." (Emphasis ours.)

Also, in 67 C.J. 1130 the subject is discussed. We quote:

"A Spanish or Mexican pueblo organized in California under the laws, institutions, and regulations of Spain or Mexico acquired a prior and paramount right to the use of the waters of rivers or streams passing through and over or under the surface of their allotted lands so far as was necessary for the pueblo or its inhabitants, and had the right to distribute to the common lands and to the inhabitants of the pueblo the waters of a nonnavigable river on which the pueblo was situated. A municipal corporation which is the successor to such a pueblo succeeds to such rights and holds the water rights of its predecessor in trust for its inhabitants." See also 94 C.J.S. Waters § 231.

Weil on Water Rights (3rd Ed.) 68, gives a good statement of the doctrine, as follows:

"Under the Mexican law, agricultural settlements or 'pueblos' located on public land had ipso facto a concession of the waters on the surrounding public lands, so far as necessary for the general supply of the settlement. This right in the pueblo was superior to that of any riparian proprietors; because any riparian proprietors, perforce, acquired private title to public riparian land subsequent to the establishment of the pueblo, since the pueblos colonized uninhabited regions. The pueblo right prevailed because it was acquired on public land before there were any riparian proprietors. The city of Los Angeles has, after much litigation, been held to succeed to the rights of the pueblo, from which it grew, to a public water supply from the Los Angeles River which runs through it. The extent of the city's right of use under this claim is now settled to include the entire flow of the river, which may be used in parts of the city either within or outside the original pueblo limits."

In 56 Am.Jur. 953, the author of the text recognizes the doctrine. He states:

"Under Mexican law, a pueblo was entitled to so much of the waters of a stream flowing through it as was necessary for municipal purposes and for the supply of its inhabitants. This right was superior to those of riparian proprietors. The present cities which are

the successors of the Mexican pueblos have the same rights as the pueblos."

And in California the priority of right in a colonization pueblo to take all the waters of a non-navigable stream for the use of its inhabitants on an expanding scale necessary for the benefit of its inhabitants was early recognized and enforced. Hart v. Burnett, 15 Cal. 530; Lux v. Haggin, 69 Cal. 255, 4 P. 919, 10 P. 674; Vernon Irrigation Co. v. City of Los Angeles, 106 Cal. 237, 39 P. 762; City of Los Angeles v. Los Angeles Farming & Drilling Co., 152 Cal. 645, 93 P. 869, 1135; City of San Diego v. Cuyamaca Water Co., 209 Cal. 105, 287 P. 475; City of Los Angeles v. Pomeroy, 124 Cal. 597, 57 P. 585; Hooker v. City of Los Angeles, 188 U.S. 314, 23 S.Ct. 395, 47 L.Ed. 487; Treaty of Guadalupe Hidalgo.

In Volume 1 of Weil on Water Rights in the Western States, page 68, it is said:

"Under the Mexican law, agricultural settlements or 'pueblos' located on public land had, *ipso facto,* a concession of the waters on the surrounding public lands, so far as necessary for the general supply of the settlement."

It was as early as 1789 that the King of Spain established the Town of Pictic in New Spain and gave the settlement preferred rights to all available water from which evolved the doctrine of Pueblo Rights. 1 Kinney on Irrigation and Water Rights 996. And as shown by the quotation from Kinney in State v. Tularosa Community Ditch, supra, the King decreed that thereafter the general plan followed in the foundation of the Pueblo of Pictic should be followed in the foundation of any new pueblos in California, Arizona, *New Mexico* and Texas.

Of course, the courts are entitled to take judicial notice of the laws of another state or foreign country from which the state of the forum was formed. In 20 Am. Jur. 74, § 49, Title, Evidence, the text states:

"The rule that courts do not take judicial notice of the laws of another state or a foreign country does not apply to the laws of a state or country from which the state of the forum was formed. In such a situation the laws of the mother state or country which were in existence at the time of the separation will be judicially noticed. In California the Mexican Civil law and the acts of the Mexican Government are judicially noticed by the courts; the courts of Louisiana and Missouri take judicial cognizance of the French and Spanish law formerly prevailing in their jurisdictions. Similarly when territory is acquired, judicial notice must be taken not only by the local courts but by the Federal Courts, of the law existing in such territory prior to its acquisition."

It is urged upon us by counsel for the plaintiffs that the Las Vegas Grant is not

within the portion of New Mexico protected by the Treaty of Guadalupe Hidalgo, being originally a part of the State or Republic of Texas. The trial court properly rejected this contention. Jones v. St. Louis Land & Cattle Co., 232 U.S. 355, 34 S.Ct. 419, 58 L.Ed. 636; United States v. Maxwell Land-Grant Co. cases, 121 U.S. 325, 7 S.Ct. 1015, 30 L.Ed. 949; State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421. Compare Yeo v. Tweedy, 34 N.M. 611, 286 P. 970.

■ We are unable to avoid the conclusion that the reasons which brought the Supreme Court of California to uphold and enforce the Pueblo Rights doctrine apply with as much force in New Mexico as they do in California. A new, undeveloped and unoccupied territory was being settled. There were no questions of priority of use when a colonization pueblo was established because there were no such users. Water formed the life blood of the community or settlement, not only in its origin but as it grew and expanded. A group of fifty families at the founding of a colony found it no more so than when their number was multiplied to hundreds or even thousands in an orderly, progressive growth.

And just as in the case of a private user, so long as he proceeds with due dispatch to reduce to beneficial use the larger area to which his permit entitles him, enjoys a priority for the whole, so by analogy and under the rationale of the Pueblo Rights doctrine, the settlers who founded a colonization pueblo, in the process of growth and expansion, carried with them the torch of priority, so long as there was available water to supply the life blood of the expanded community. There is present in the doctrine discussed the recognizable presence of *lex suprema,* the police power, which furnishes answer to claims of confiscation always present when private and public rights or claims collide. Compare, Middle Rio Grande Water Users Ass'n v. Middle Rio Grande Conservancy Dist., 57 N.M. 287, 310, 258 P.2d 391. So, here, we see in the Pueblo Rights doctrine the elevation of the public good over the claim of a private right.

Let it be said in closing that the trial judge, if we correctly interpret his decree, and we feel we do, sustained the claim of defendant and intervenor to a priority over plaintiffs under an application of the doctrine of pueblo rights. There was, indeed, no controversy between the intervenor and defendant. Both alike prayed for dismissal of plaintiffs' complaint. This is exactly what the court did. The defendant's claim of priority was under franchises from the Town and City of Las Vegas. Note this language of paragraph 9 of the answer of defendant, to wit:

"That Defendant has never diverted, stored or used any of the water of said river, except such as was reasonably required as an adequate supply for the

present or immediate prospective needs of said City and Town and their inhabitants; that if said diversion, storage or use of said water by Defendant has deprived Plaintiffs, or any of them, of water which they might otherwise have had, the same has been within the paramount and preferred and prior right of said City and Town, and within the right of Defendant as the instrumentality of said City and Town for so diverting, storing and distributing said water."

One has only to read finding No. VIII, supra, and Conclusion of Law No. III, supra, to observe that this theory of the defendant has been carried forward into the findings and conclusions and established by the decree. Whatever the defendant has done in distributing water to the Town and City of Las Vegas and their inhabitants has been in the name and right of said Town and City as successor to Nuestra Senora de Las Dolores de Las Vegas and "as the agent and instrumentality of said City and Town," acting under franchises from them.

Public Service Company does not own the pueblo rights of said City and Town, as the trial judge viewed the matter. His findings, conclusions and judgment so reflect and affirm. It merely acted as the agent and instrumentality of said City and Town in enabling their inhabitants to enjoy to the fullest extent the pueblo rights inaugurated by the King of Spain. Yet, even he, the King,

but bespoke a fact of life as ancient as the hills when he became author of the Plan of Pictic. Water is as essential to the life of a community as are air and water to the life of an individual. It is frequently mentioned as the "life blood of a community." It is precious. It is priceless. A community, whether corporate or not, possessing such an indispensable right can neither sell, barter, exchange, or give it away. Either this is so, or the supposed *benefaction* of the King of Spain in inaugurating the Plan of Pictic became in reality an *obituary* instead. Water is essential to life. Without it we perish.

Furthermore, we can no more ignore the Pueblo Rights doctrine as a major issue in this case than could we with propriety decline to entertain this appeal. It is raised both by defendant's answer and the "further, separate" and affirmative defense of intervenor filed in the cause, and so recognized by Judge Brand in his letter to all counsel under date of January 30, 1956, and the judgment itself. Either the court and all counsel at the pre-trial conference misapprehended what the major issue was, or it projected itself as such surely and unmistakably.

We think the trial court was correct in sustaining the claim of defendant and intervenor under the Pueblo Rights doctrine. Other collateral questions are argued but they either are resolved by what we have said, found to be without merit, or unneces-

sary to determine. The findings and conclusions are supported by substantial evidence and the judgment should be affirmed.

It will be so ordered.

LUJAN, C. J., and COMPTON, J., concur.

SHILLINGLAW, J., not participating.

FEDERICI, D. J., and McGHEE, J., dissenting.

FEDERICI, District Judge (dissenting).

First, it is the opinion of this writer that this is not a proper case in which to determine the applicability of the doctrine of Pueblo Water Rights in the State of New Mexico. This is so for the simple reason that the intervenor Town of Las Vegas does not in this action affirmatively assert such rights, or title to the waters, in itself, and it is the only possible party that could attempt to do so. True, the answers of intervenor and defendant Public Service Company make the bald declaration that the Public Service Company through its franchise and pertinent ordinances "is the instrumentality of the intervenor" which assertions stand denied by order of record entered by the trial court. Certainly the Public Service Company may be an instrumentality of the Town of Las Vegas—but only for the purpose of gathering and distributing the water. One may read the franchises and ordinances in vain to try to find any language where the Town of Las Vegas at any time conveyed or passed any title whatsoever to any of its water rights to the utility. Actually just the opposite is expressed in the enabling Ordinance No. 1021 adopted September 1, 1947. Section VIII thereof expressly provides as follows:

"The Town of Las Vegas in granting this franchise surrenders no privileges or rights that it may now have or possess of acquiring, owning or installing a water supply system and furnishing the same to the Town of Las Vegas and the inhabitants thereof."

If the intervenor Town of Las Vegas has an alleged Pueblo Water Right it has not asserted title affirmatively thereto in itself in this action, and the Public Service Company just cannot assert such a right in itself from the documentary evidence found in the record. Consequently there is no need in this action to even discuss the pros and cons of the so-called Pueblo Doctrine.

If the Public Service Company has any water rights on the Gallinas River it is by virtue of its predecessor in interest (another utility company) having been adjudged a water right of 2,600 acre feet with a priority of 1881 in the Hope Community Federal District Court case, in which case these plaintiffs were parties.

As between these plaintiffs and the defendant Public Service Company that is the limit of their right, and the sole issue to have been determined by the trial court was whether defendant Public Service Company was using more water than the allotted 2,600 acre feet, with an 1881 priority to the damage of other appropriators, namely plaintiffs herein.

See Bounds v. Carner, 53 N.M. 234, 205 P.2d 216, 221, where this Court, speaking through an opinion by Justice Brice, concurred in by Justice Lujan, Justice Sadler and Justice Compton and dealing with the same Hope Community Ditch decree here involved, said:

"The third ground upon which it is claimed that the decree is not res judicata is that all of the water right owners were not made parties to the suit. In a suit of that magnitude, it is almost certain that some interested persons will not be made parties. The Roaches, who were defendants below, apparently had water rights, but were not made parties to the suit. A statute under which the suit was instituted provides:

" 'In any suit for the determination of a right to use the waters of any stream system all those whose claim to the use of such waters are of record and all other claimants, so far as they can be ascertained, with reasonable diligence, shall be made parties.' Sec. 77–406, N.M.Sts.1941.

"It is thus provided for the eventuality that some persons might not be made parties to the suit who claim the right to the use of the water from the stream system involved. The fact that all of the persons entitled to the use of water from the Pecos River Streams System were not made parties to the Federal suit does not invalidate the decree. *It is binding on all who were parties.* (Emphasis of Writer.) * * *

"According to the decree the water right of each defendant was fixed and determined as against plaintiff and against every and all other defendants; as the following provisions therein show:

" 'That it is the intent and purpose of this decree, and it shall be so construed, to fix and determine, not only the water rights of the plaintiff, the United States of America, as against the water rights of each and every defendant herein, but to also fix and determine the water rights of each and every defendant herein as against the water rights of said plaintiff and of each, every and all other defendants *inter se.* (Emphasis of Writer.)

" 'That each and every of the parties to this suit, his, hers, or its successors and assigns, and his, hers or

its agents and servants, be and they are hereby forever restrained and enjoined from violating or attempting to violate any of the provisions of this decree; from interfering with or attempting to interfer with any other party hereto, his, hers or its successors and assigns, in the lawful or proper use of water under such rights herein decreed. * * *'"

The parties in the lower court and here, as well as the trial judge, considered the Hope decree as being before the court for purposes of this lawsuit. In any event it was before the lower court, and it is before this Court, by virtue of Rule 44(d) of our Civil Procedure providing that "the courts of the state of New Mexico shall take judicial notice of * * * public and private official acts of the * * * judicial departments of * * * the United States." Certainly the entry of the decree by the Federal District Court in the Hope case is an official act by a judicial department of the United States. Certainly as between these plaintiffs and the Public Service Company the Hope decree is res judicata and their respective rights must be based thereon, unless the parties have since the date of that decree acquired additional water rights by purchase, new appropriations, or even by prescription if prescriptive rights are acquirable under law in this state.

It is not amiss to point out here that the record in this case shows that on January 6, 1949, defendant Public Service Company filed with the state engineer's office an application numbered 2662 for permit to construct, maintain and operate a reservoir, with a capacity of 159.5 acre feet for storage purposes, setting out in said application their water right to be 2,600 acre feet of water per annum "exclusive of seepage and evaporation." The record further shows that said application was protested by other appropriators resulting in a stipulation deleting the words "exclusive of seepage and evaporation." This was followed by an order signed by the state engineer dated February 8, 1950, which order refers to the Hope decree, and which order approved the said application with the express proviso that the waters to be diverted from the stream system "not exceed 2,600 acre feet of water per annum." Here we have the defendant Public Service Company before the state's official water agency declaring it has only a 2,600 acre feet of water right per annum; and the state engineer, long after the date of the Hope decree re-confirming, re-declaring, and re-restricting defendant Public Service Company to a 2,-600 acre feet of water right per annum. How in the name of recognized New Mexico water law and under the documentary evidence in this case can defendant Public Service Company now be heard to claim that it is entitled, if necessary, under an alleged Pueblo Doctrine, to take the whole of the water from the natural upper public

water courses of the applicable stream system?

The findings of the lower court and the conclusions drawn therefrom being based on documentary evidence this Court is not bound thereby under the usual substantial evidence rule; and this Court from the documentary evidence may draw its own conclusions and this writer's conclusions differ from those of the trial court on the construction placed on this documentary evidence.

For the reasons above stated it is the opinion of this writer that the defendant Public Service Company cannot defend itself behind the alleged shield of Pueblo Doctrine in this action.

Secondly, the only way the defendant Public Service Company can possibly assert the doctrine of Pueblo Rights is that in this action it is acting under a trust relation for the intervenor Town of Las Vegas and its inhabitants, either by operation of law or by virtue of the pertinent ordinances and franchises. Mainly and basically that is the only meaning that can be given to Justice SADLER'S opinion. That is exactly the meaning that must be given to his opinion, and although his opinion in this respect is couched in the very careful use of language, he nevertheless must and does find a trust relation existing between the defendant utility company and the inhabitants of the Town of Las Vegas. See for example his language at the top of page 18 of the original typed opinion when after analyzing the recognition of the Pueblo Rights Doctrine by the lower court Justice SADLER states that the lower court "did recognize the doctrine and apply it to the facts found, *thereby upholding the doctrine in its relation to* the rights of the Town of Las Vegas, the City of Las Vegas and *the defendant.*" (Emphasis of Writer.)

In upholding the doctrine in the defendant Utility Company Justice SADLER of necessity bottoms his opinion on the inescapable legal conclusion that the Public Service Company claims priority over the plaintiffs mainly and basically as trustee for all of the inhabitants of the Town of Las Vegas by operation of law and/or by virtue of franchises under which it distributes water to them. This writer does not take issue with Justice SADLER on this point for purposes of this portion of this opinion.

What Justice SADLER says about this obvious trusteeship can have only one meaning and that is that the *Utility Company* in a trustee position may, and if it is a trustee must, assert these Pueblo Rights in this action on behalf of its cestui que trust, namely the Town of Las Vegas and its inhabitants. It must logically and legally follow therefore, that even if the Town of Las Vegas had not intervened, the Utility Company would have had to assert this Pueblo Right, as it did, and that any judg-

ment entered against the Utility trustee would be binding on the Town of Las Vegas and become res judicata as to the Town also; and from the motion to intervene it will be noted that this was just exactly the fear that possessed the Town of Las Vegas to intervene.

Now then, if the Utility Company can hold and claim as trustee for the Town of Las Vegas in this case, then the Utility Company in the Hope case could hold and claim as trustee, and if the Utility Company was a party, as it was, in the Hope case, an adjudication of the water right pertaining to the Utility Company in the Hope case now becomes res judicata also as to the Town of Las Vegas. In other words, we can't have the present Utility Company as a trustee in this case in one breath, and in the next breath say that the predecessor Utility Company in the Hope decree was not in a position of trustee.

It must be borne in mind that the Utility Company was adjudged a water right by the Hope decree. It must also be borne in mind that the Town of Las Vegas was a party to that action. True, the Town of Las Vegas did not file an answer or make claim itself to any water rights in that action, but there was an appearance made by counsel representing the Town of Las Vegas. Attorney John D. W. Veeder appearing before the Special Master in the Hope case, which is an appearance before the court, said:

"I also appear for the Town of Las Vegas, and consumers of water of the Town of Las Vegas, in the event it becomes necessary to appear for said parties by reason of any adjudication of the title to the water between them and the Agua Pura Company as to the water rights of the consumers of the Town of Las Vegas."

The Agua Pura Company was the Utility Company, predecessor to the present Utility Company. The only reservation made in this appearance on behalf of the Town is. that any adjudication of water rights made by the court to the Utility Company would not prejudice the rights of the Town of Las Vegas to said adjudicated waters or any portion thereof as between the Utility Company and the consumers of the Town of Las Vegas. The appearance by counsel for the Town of Las Vegas can only be construed as meaning something like this, "we are not going to ask for an adjudication in this case because, after all, our trustee in fact or in law, the Utility Company is appearing here, and as such trustee they are duty bound and will assert for us all our water rights. We want it, however, understood that just because the Utility Company is adjudicated the water rights, that doesn't mean that the water right belongs to the Utility Company, and we want nothing in this decree to prejudice or bar the Town of Las Vegas from asserting any such adjudicated water rights or portions thereof

from the Utility Company." If counsel for the Town of Las Vegas construed the relationship between the Town and the Utility Company as Justice SADLER apparently construes it, and he may so have done, the only meaning that can be given to Mr. Veeder's appearance is as above paraphrased, and the Hope decree respected that request and in that very meaning. See the language of the Hope decree as set out in Bounds v. Carner, supra.

If a relation of trust exists now between the Town and the Utility Company it follows a fortiori that the same relationship existed between the Town and the Utility Company in the Hope case, and if so then the Hope decree is res judicata not only as to the Utility Company but also as to the Town of Las Vegas.

The reason for this is simple, and that is that it was first incumbent upon the Town of Las Vegas to assert its Pueblo Rights in the Hope case. When the Town of Las Vegas decided to let the Utility Company assert the Town's rights because of the trust relation it then became the duty and was incumbent upon the Utility Company to assert the Pueblo Rights on behalf of its cestui que trust, the Town in that action. Otherwise the Utility Company and the Town would be forever barred from reasserting such a right or any right other than that which was asserted in the Hope case, the result of which was a decree adjudicating in the Utility Company and in the Town of Las Vegas a water right of 2,600 acre feet with a priority of 1881, in which perhaps even the City of Las Vegas shared an interest.

Under Bounds v. Carner, supra, if we are to follow the doctrine of stare decisis and follow precedent of our own Court, we must find the Hope decree binding on all who were parties, either directly or in a representative capacity through the Utility Company and hold as stated in the Bounds case that the Hope decree fixed and determined the water rights of each and every defendant therein, whether as a direct party or as a beneficiary under a trust, "inter se." In other words to be consistent we must hold that even if the Doctrine of Pueblo Rights is applicable in this state the rights of both the Town and Utility Company became res judicata by the Hope decree, and that is the opinion of this writer.

Bounds v. Carner, supra, set at rest the water rights adjudicated in the Hope decree not only as between the plaintiff United States for the benefit of the Carlsbad project, but also inter se between all defendants, including the Town of Las Vegas and the Utility Company.

Justice SADLER'S opinion actually overrules Bounds v. Carner and will cast a cloud on all stream rights in the Pecos stream system, to say nothing of what will happen to the Rio Grande water rights as shown by briefs herein of amicus curiae.

Finally it is the opinion of this writer that the Doctrine of Pueblo Water Rights as enunciated by the California courts should not be followed and declared to also be the law of New Mexico.

A voluminous treatise would be required on the history of Spanish law, Mexican law, California law and New Mexico law and history in order to do justice to this broad subject, but the pressure of business of this writer's own court will not permit at this time and in this opinion to do full justice to the subject, and of necessity only the highlights of some of the points will be briefly touched upon.

On two prior occasions this Court has carefully desisted from expressing an opinion that the Pueblo Rights Doctrine applied in New Mexico. See, State ex rel. Community Ditches v. Tularosa Community Ditch, 19 N.M. 352, 143 P. 207, and New Mexico Products Co. v. New Mexico Power Company, 42 N.M. 311, 77 P.2d 634, and had this Court really wanted to have applied said Doctrine in the New Mexico Products case by presuming that Santa Fe was a Pueblo, as the California courts presumed in their cases, this Court could well have applied said Doctrine at that time but refused to do so.

A search of what writers on the subject have had to say on Pueblo Rights in the light of this Court's decision in the New Mexico Products Company case, attention is called to the statement shown on page 136, 27 Rocky Mountain Law Review, University of Colorado, Volume 27, No. 2, February, 1955, wherein is found the following:

"California seems to be the only state which has enforced these rights, and it has been there held that a modern city's pueblo right, which had lain dormant for over a century, was superior to the right of an irrigation company that had expended large sums in the development of a project. There ·has been a suggestion that the modern pueblo rights enforced in California ·are considerably broader than the ancient rights originally granted, *and the New Mexico court has doubted whether such a right could coexist with the present state constitution and laws.*" (Emphasis of Writer.)

This writer subscribes to the above interpretation of the New Mexico Products Company case.

There are many reasons why this Court should not follow the California cases which have engrained their strained interpretation of the Pueblo Doctrine to the many other apparent hybrid doctrines also existing in that state, including the riparian doctrine and the doctrine of appropriations; all of which constitute a confusing mess of California water rights which neither the California courts nor the California statutes or constitution, as amended have as

94

yet been able to clarify. And at this point it might be pertinent to point out that even in California, so far as this writer is able to ascertain, even there the courts in applying the Pueblo Doctrine have found solace in state statutes existing at the time of the decisions, a circumstance nonexistent even to this day in New Mexico in so far as incorporated successor municipalities of Mexican Pueblos are concerned. Through all of these years our legislatures, both territorial and state, have remained silent and have not recognized the Pueblo right and as will hereinafter be pointed out just the opposite has been expressed by legislative acts, the state constitution, and court decisions adhering strictly to what is known among all writers of water law to be the true Colorado Doctrine of prior appropriation.

It is true that Kinney in his texts on irrigation and water rights as well as Weil in his texts, especially on water rights in western states, devote space to the Doctrine of Pueblo Rights as enunciated by the California court, but so far as this writer has been able to ascertain all that these eminent text writers have done, as of the dates of their publications, is merely to point out objectively what the California courts had held. Nowhere has this writer found where these eminent authors have expounded the thought that this rule should likewise be followed in other western states. Even Kinney in his works on irrigation and wa-

ter rights, pp. 2591–93, speaks of Pueblo Rights as compared to riparian rights and not as compared to rights acquired under the Doctrine of prior appropriations. He says:

"It therefore follows that a city succeeding to the right of a pueblo has a preference or prior right to consume the waters of a natural stream and its tributaries, even as against an upper *riparian proprietor* to the full extent as may be necessary for its inhabitants and for general municipal purposes." (Emphasis of Writer.)

Weil, likewise, on water rights, 3d Ed., page 68, states as follows:

"Under the Mexican Law, agricultural settlements or 'pueblos' located on public land had ipso facto a concession of the waters on the surrounding public lands, so far as necessary for the general supply of the settlement. This right in the pueblo was superior to that of any *riparian* proprietors; because any *riparian* proprietors, perforce, acquired private title to public *riparian* land *subsequent* to the establishment of the pueblo, since the pueblos colonized uninhabited regions. *The pueblo right prevailed because it was acquired on public land before there were any riparian proprietors.*" (Emphasis of Writer.)

It is interesting to note further that Weil bases the reason for the rule on the

fact that the colonization as agricultural settlements or pueblos took place in uninhabited regions and were the first to make use of the water. This is not true from the facts borne out in the case at bar, for it appears that when the Pueblo of Nuestra Senora de Las Dolores de Las Vegas was colonized there were prior settlers in the area. It appears from the report of the Surveyor General of the United States, William Pelham, an exhibit in this case, that as early as January 16, 1821, Luis Maria Cabeza de Baca in his name and the name of his children petitioned the Provisional Deputation of the state of Durango, in Mexico, for a tract of land suitable for cultivation and pasture, called the Vegas Grandes, on the Gallinas river in the jurisdiction of El Bado. In this petition Baca stated that a former petition had been made to the authorities of the Province of New Mexico and that by decree dated February 18, 1820, the land was granted to him and others, and that on October 17, 1823, Bartolome Baca, political chief of New Mexico, directed the Alcalde of El Bado to place Baca in possession of the land petitioned for.

On February 27, 1825, Juan Bautista Vigil, Secretary of the New Mexico Deputation, certified that on the 16th of February, 1825, a petition of Don Juan Antonio Cabeza de Baca, son of Luis Maria Cabeza de Baca, was read, in which reference was made to the grant made in the year 1821,

and it was resolved by the Deputation that the grant made by the State of Durango be ratified, and the Territorial Justice of El Bado, Salvador Montoya, be required to place Baca in possession. On January 13, 1826, the Governor Narbona again ordered the Justice to place the parties in possession, and the parties thereafter were placed in possession.

The claim of the Town of Las Vegas was instituted on the 20th of March, 1835, when Juan de Dios Maese and a number of others petitioned the corporation of El Bado for a tract of land for cultivation and pasture. On March 23, 1835, the Territorial Deputation made the Grant and on the 24th of March, 1835, Political Chief Francisco Sarracino directed the Constitutional Justice of El Bado to place the parties in possession which was done on April 6, 1835.

In 1837 the heirs of Luis Maria Cabeza de Baca protested against the occupancy of land by Juan de Dios Maese and the others who initiated their claim and what is now the claim of the Town of Las Vegas on the 20th of March, 1835.

On May 19, 1860, Senate Report No. 228, Thirty-sixth Congress, First Session, was made by the Committee on Private Land Claims concerning the conflicting claims of the heirs of Luis Maria Cabeza de Baca and the Town of Las Vegas (Tr. 108, P.Ex. 1). The report states that the Grant to Baca was in fee and is a genuine

and valid title, and that Congress, being bound to legislate in such a manner as to prevent litigation which would involve entire settlements of families, several hundred families having expressed a willingness to waive their older title in favor of the settlers, if allowed to enter an equal quantity of land within the Territory of New Mexico, the Committee on Private Land Claims, accepting the proposal, thereafter prepared an amendment to House Bill No. 195 embracing the provisions of the Report. On June 21, 1860, an Act was passed by Congress confirming certain private land claims in the Territory of New Mexico. This act confirmed the Las Vegas Grant (Tr. 137, Defendant and Intervenor's Exhibit No. 2). Section 4 of the Act provided that the confirmation was no more than a quitclaim or relinquishment on the part of the United States and did not affect the adverse rights of any person or persons whomsoever. Thereafter, a patent was issued to the Town of Las Vegas on June 27, 1903 (Tr. 134, Defendant and Intervenor's Exhibit No. 2), the patent also stating that it was to be construed only as a relinquishment or quitclaim by the United States.

The Baca heirs having relinquished their rights, it appears that they then moved into the Jemez country. At any rate it certainly appears from the record that there were prior settlers on the Gallinas with older and valid title. This being so then even according to Weil's statement above, the reason for the application of the Pueblo Rights Doctrine does not apply in the case at bar because it was not the case of Las Vegas being colonized in an uninhabited area and such colonizers being the first to use the lands and the waters on the Gallinas. The issue here is as to the use of the water of the Gallinas river and this writer from the documentary evidence in the case has no hesitancy in concluding that the Town of Las Vegas is in no position to assert a Pueblo Right to waters, and in concluding further that its rights, if any, are derived from the waiver of the older and valid title of the Baca heirs as pointed out in the report of the Surveyor General; and it is elementary that as applied to the facts in the case at bar a waiver by the Baca heirs was an intentional relinquishment of a known right, and the Town of Las Vegas arrived at its title not because of its Pueblo Rights or because it was proclaimed a Pueblo, confirmed by Congress, and patent issued, but rather the Town of Las Vegas arrived at its title by way of a prior grant to Luis Maria Cabeza de Baca and the Town's title was not perfected until the waiver by the Baca heirs in the year 1860.

Appellees further argue that the Mexican Water Laws of Pueblo Rights based on the "Plan of Pitic" or "Pictic" should prevail and be applied in the instant case. In the year 1789, the King of Spain established the

Town of Pitic in the State of Sonora, Mexico, setting out quite at length rules and regulations pertaining to colonization in Mexico. From a reading of the several sections of the plan of Pitic there does not to this writer appear therein any actual grant of title to the waters to the Pueblos. The grant is general in nature and even if the grant were to include water, the grant is not merely to a compact pueblo or settlement, and this is clearly shown by the language of Section 7 of the plan which provides as follows:

"7th. The residents and natives shall enjoy equally the woods, pastures, *water privileges,* and other advantages of the royal and vacant lands that may be outside of the land assigned to the new settlement, *in common with the residents and natives of the adjoining and neighboring pueblos, which bounty and privilege shall continue as long as they are not changed or altered by his Majesty,* in which case they shall conform to that which has been provided in the Royal orders that may be issued in favor of the new possessors or owners (proprietarios)." (Emphasis of Writer.)

Section 19 of the plan of Pitic further provides in part as follows in outlining the powers of the Commissioner:

"* * * that he cannot and shall not have the power to take the water of another, nor in a greater quantity than that which may fall to his share, for which purpose and that it may not increase in injury to the owners situated on the land beyond or still lower. * * *"

From the foregoing language in the plan of Pitic it is the view of this writer that the California decisions on the Pueblo Water Rights Doctrine stretched the meaning and context of the plan out of proportion and beyond its original intended meaning for colonization, and for that reason this writer cannot subscribe to the interpretation placed upon the plan of Pitic by the California decisions relied upon by Justice SADLER.

Further as this writer views it, the plan of Pitic provides that water shall be used for irrigation and administered by the pueblos. If the Pueblo of Las Vegas was established pursuant to the plan of Pitic then it seems obvious that the appellants here are entitled to as much benefit, if not more so, than are the appellees. If the plan of Pitic transfers title to the water to the Pueblo of Las Vegas in trust, then the trust was and must be just as much for the benefit of irrigated lands as it was and must be for the other inhabitants of the pueblo. There is no place in the plan of Pitic which gives a preference to domestic users of waters rather than to other users. If the present town of Las Vegas is the successor in title and interest to the original Pueblo of Las Vegas, and if the trust of

the water rights was granted to the original pueblo pursuant to the plan of Pitic, then the present administrators of that trust are obligated to distribute the water to the irrigators as well as to other users. If the plan did, in fact, grant title to water in trust to the original pueblo, then the appellants before this Court are beneficiaries of that trust since the Hope Community Decree provided that their priority was established prior to the conquest of New Mexico by the Americans.

This writer, therefore, cannot subscribe to the theory of Justice SADLER that the plan of Pitic gives some of the beneficiaries of the trust (the Town of Las Vegas) perference over the other beneficiaries, namely appellants using water for purposes of irrigation. The case of Lux v. Haggin, 69 Cal. 255, 4 P. 919, 10 P. 674, is the key California decision and is the key case relied upon by Justice SADLER in his opinion. A careful reading of that case satisfies this writer that the author, Justice McKinstry, did not and could not rely on the plan of Pitic and Mexican laws solely for his conclusion that the pueblos were granted such sweeping water rights as concluded by him in his opinion and which Justice SADLER seeks to follow. Justice McKinstry did not and could not apply the Mexican Pueblo Water Rights Doctrine alone, but in order to reach the conclusion that he did he went farther and established a new doctrine of his own, which this writer can only earmark as the "California Pueblo Water Rights Doctrine." Consequently, this writer cannot go along with Lux v. Haggin and stretch the Mexican Law of Pueblo Rights, even if the Mexican law were to prevail in this case on Pueblo Rights, of which this writer does not admit if the interpretation placed thereon by the California courts is to be here followed, all as will hereinafter be further pointed out. In this connection, it is interesting to note that Vincent Ostrom, in his book, Water and Politics, clearly shows the reason for the development of the political basis for the California Pueblo Water Rights Doctrine; and therein he explains how Los Angeles being thwarted by the courts in her attempts to expropriate all the waters of the Los Angeles river, then went to the legislature and after legislation was adopted favorable to the municipality the statutes were upheld although the courts prior to such legislation had refused to uphold the claims of Los Angeles to the water. This is mentioned here to point up the proposition that this California Pueblo Water Rights Doctrine is a hybrid mixture of the application of (1) Spanish and Mexican law as far as it could be applied and stretched, plus (2) California cases and decisions originally dealing only with land titles and not water rights plus (3) legislative enactment; and this writer has heretofore pointed out herein that we have no legislative enactments to aid appellants in

this particular case and the California courts, as this writer understands their decisions, have always held that the legislature had control of the trust even under their doctrine. The New Mexico legislature has never delegated or surrendered its power and control over the execution of the trust to the Town of Las Vegas. In any event, this writer reiterates that this Court should not blindly follow the California decisions, the result of which would be to disrupt water titles throughout the length and breadth of the State of New Mexico, titles and property rights which have reposed unmolested and have been passed upon and recognized for centuries.

The reason this writer mentions these various points is to spotlight the idea that to now inject a new theory of water law in the State of New Mexico is not as easy and clear cut as Justice SADLER would have us believe in his opinion, and before we deviate from our age old doctrine of prior appropriation, we should be very sure of ourselves. To this end this writer will suggest a few more reasons to show how clouded the situation is, rather than being so clear and convincing as stated by Justice SADLER.

Justice SADLER holds of necessity that the Las Vegas Grant is protected by the Treaty of Guadalupe Hidalgo. In this connection it is interesting to point out that .there appear of record in this case two maps, one being the J. Disturnell map of the United Mexican States and the other being a United States Department of Interior map, both of which maps show that the Town of Las Vegas lies to the east of the lands covered by the Treaty of Guadalupe Hidalgo.

Coan in his History of New Mexico, Vol. 1, page 334, says that " * * * the eastern half of New Mexico was considered as annexed by the annexation of Texas," and the author also points out that in General Kearny's first proclamation, in Santa Fe, stated in that document "that the country east of the Rio Grande would be occupied as a part of the republic of Texas."

Twitchell, in his Leading Facts of New Mexico History, Vol. 2, p. 280, points out that Texas was paid $10,000,000 by the federal government for the claim of Texas to lands east of the Rio Grande. See, also, chapter 30, entitled "Boundaries" of Vol. 2 of Great Rivers—The Rio Grande— (Mexico and the United States) of the very recent work by Paul Morgan.

At any rate, history leaves no doubt that Texas did claim the lands upon which the Town of Las Vegas is situated, and that Kearny in his first proclamation stated that the same was being occupied as a part of the state of Texas, and that thereafter the United States paid to Texas the sum of $10,000,000 for the claim of Texas to these lands and others. If it should be that the Town of Las Vegas became a part of the

United States by the annexation of the state of Texas in 1845, then it might well be questioned whether the Treaty of Guadalupe Hidalgo, which was ratified in 1848, would afford the Town much protection.

In this connection see, also, Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, 978, where Justice Parker dissenting on Motion for Rehearing referring to the Artesian basin in the Pecos Valley said:

"In the second place, we did not acquire the territory in which this artesian basin lies from Mexico, but we acquired it from the Republic (afterwards state) of Texas. See 8 U.S.Stat. 511, 5 U.S.Stat. 797; 9 U.S. Stat. 108; Id. 446, the act establishing the territory of New Mexico, and under which the United States paid Texas $10,000,000 to establish its western boundary where it now is and to cede to the United States all its claims to territory west of that line, Texas having theretofore claimed to the Rio Grande *from its mouth to its source.* See 9 U.S.Stat. 1005, for proclamation by the President that said arrangement had been consummated. The United States has never received from Mexico any grant or cession of lands east of the Rio Grande. See Treaty of Guadalupe Hidalgo, Code 1915, p. 21, and the Gadsen Treaty, Code 1915, p. 32." (Emphasis of Writer.)

Query: Does the Treaty of Guadalupe Hidalgo afford protection to the Town of Las Vegas?

Next, this writer would point out that the adoption in this particular case of any Pueblo Water Rights Doctrine as said Doctrine has been interpreted and construed by the California Court, would violate the terms of Article IX of the Pecos River Compact, found in the footnotes under Section 75–34–3, N.M.S.A. 1953, and providing as follows:

"In maintaining the flows at the New Mexico-Texas state line required by this Compact, New Mexico shall in all instances apply the principle of *prior appropriation* within New Mexico." (Emphasis of Writer.) Laws 1949, c. 6.

This compact is a binding obligation upon the state of New Mexico and has the full force and effect of law comparable to a treaty. No exception is made in the compact to any Pueblo Rights of the Town of Las Vegas or of the Public Service Company of New Mexico, appellees in this action who are here claiming additional waters from the Pecos Stream System other than by appropriation.

At this point this writer wishes to emphasize that he is not saying that the appellee Town of Las Vegas should be deprived of necessary municipal water. It is the firm conviction of this writer that

municipalities do have a preferential right but such right is a preference as developed by the law of appropriation rather than preference as set out in the California cases. This Court has repeatedly held that New Mexico follows the Colorado Doctrine. *The Colorado courts allow a preference but require compensation.* See an article by Professor Frank J. Trelease entitled "Preferences to the Use of Water," published in the Rocky Mountain Law Review, Vol. 27, p. 133. See, also, Montrose Canal Company v. Loutsenhizer Ditch Company, 1896, 23 Colo. 233, 48 P. 532; Town of Sterling v. Pawnee Ditch Extension Company, 1908, 42 Colo. 421, 94 P. 339, 15 L.R.A.,N.S., 238, and Black v. Taylor, 1953, 128 Colo. 449, 264 P.2d 502. Further if any preferred use was intended by the Plan of Pitic or the Spanish or Mexican law the preferred use should be protected by the provision of the Colorado Doctrine rather than the California Doctrine, so far as appellee Town of Las Vegas is concerned. This is in line with the consistent decisions of this Court to the effect that the Colorado Doctrine of prior appropriation is the law of New Mexico. Hagerman Irr. Co. v. McMurry, 1911, 16 N.M. 172, 113 P. 823; Yeo v. Tweedy, 1929, 1930, 34 N.M. 611, 286 P. 970, and many others.

Furthermore and in so far as appellee Public Service Company of New Mexico is concerned, as distributive agent of waters for the Town of Las Vegas, that Utility Company may under the provisions of § 75–1–3, N.M.S.A. 1953, exercise the right of eminent domain in order to carry out its distributing obligations to the Town under the pertinent ordinances and franchises.

If Justice SADLER'S opinion becomes the law of this State a vast multitude of water users, not only on the Pecos River System but on other river systems and particularly on the Rio Grande System and its many tributaries from southern Colorado, through the whole of New Mexico, into Texas and even Mexico, will awaken to find that the water rights that were handed down to them from the first beneficial use that was ever made of said waters will have been lost as the result of a decision handed down by this Court in a case affecting only an infinitesimal part of the water users of this state, Colorado, Texas and Mexico. And further let us not forget that these older and prior water rights can even today be acquired by municipalities as above pointed out. We are not leaving the municipalities completely out in the cold, and let us also protect the rights of the rural water users with older and prior rights which are just as vital to them as they may be to a growing metropolis that would snuff them out without reasonable compensation.

Finally this writer will go further and say that in many ways New Mexico has fol-

lowed the Mexican law, traditions and customs more than any other state. This is particularly true in connection with the law of community acequias. Wells A. Hutchins has pointed out this fact in his article entitled The Community Acequia: Its Origin and Development, published in the Southwestern Historical Quarterly, No. 3, vol. XXXI (Jan. 1938). The same author has also written on Community Acequias or Ditches in New Mexico, published in the Eighth Biennial Report, State Engineer of New Mexico, 1926–1928, p. 229. Hutchins points out:

"The origin of the community acequia as an institution may be traced to Spanish and Indian sources, while its development was closely associated with the Spanish settlement of the Southwest and was continued under the Mexican and American regimes. That is, the Spanish-American community acequia was a result of merging methods of public or community handling of irrigation affairs developed independently in Spain and in the New World prior to its discovery by Europeans. * * *

"Shortly after the establishments of the Territory of New Mexico, the legislature in 1851 and 1852 provided that the course of ditches or acequias already established should not be disturbed; that all streams of water theretofore known as public ditches or acequias were thereby established as such; that overseers should be elected by the proprietors of lands irrigated by Public acequias; and that landowners should labor on the ditch in proportion to their land whether cultivated or not."

This Court held in Snow v. Abalos, 1914, 18 N.M. 681, 140 P. 1044, that the community ditch law does not confer upon community acequias the power to acquire or hold title to the water rights but that the water right is a several right owned by the individual user and perfected by applying the water to a beneficial use. The Court said, 18 N.M. at page 693, 140 P. at page 1048:

"In New Mexico, the 'Colorado doctrine,' as it is termed, of prior appropriation prevails. Established or founded by the custom of the people, it grew out of the condition of the country and the necessities of its citizens. The common-law doctrine of riparian right was not suited to an arid region, and was never recognized by the people of this jurisdiction."

The Court goes on and discusses the definition of the term "appropriation" and adopts Kinney's definition, as follows:

" 'The appropriation of water consists in the taking or diversion of it from some natural stream or other source of water supply, in accordance with law, with the intent to apply it to some beneficial use or purpose, and,

consummated, within a reasonable time, by the actual application of all of the water to the use designed, or to some other useful purpose.' "

The Court carefully points out:

" * * * *Without such precedent steps no application could be made, but it is the application to a beneficial use which gives the continuing right to divert and utilize the water.*" (Emphasis of Writer.)

The Court then goes on to apply the doctrine of appropriation to community acequias and says:

"Such being the case, we are of opinion, that prior to the enactment of the statute of 1895, supra, making such community acequias corporations, for certain purposes, each individual water user under a community acequia was the owner of a right to take water from the public stream or source from which it was drawn, which right was divorced from and independent of the right enjoyed by his co-consumer; *that the fact that such water was diverted into a ditch, owned in common with other water users, did not give such other users any interest in, or control over, the right to take water, or water right, which each individual consumer possessed;* that the right to divert water, or the water right, is appurtenant to specified lands, and inheres in the owner of the land; that

the right is a several right, owned and exercised by the individual, and, the officers of the community acequia, in diverting the water act only as the agents of the appropriator.

" * * * Where land is owned in severality, to which a water right is appurtenant, which water right is of course only a right to take from the public stream a sufficient amount of water to properly irrigate the land, we fail to understand how such a right could be owned in common with other water users." (Emphasis of Writer.)

It can thus be seen that this Court has never followed the California interpretation or communal theory as applied to the Spanish and Mexican law of water rights. The agricultural settlements in New Mexico were set up for the same purposes as those in California. The community acequias followed the Plan of Pitic just as much as the pueblo of San Diego did but the New Mexico courts have held that the water rights acquired by the agricultural settlements in New Mexico are private water rights and do not belong to the community acequias. If New Mexico had followed the California decisions in this regard, then each community acequia would have a water right and, since many Mexican or Spanish towns were founded upon the sites of these community acequias, each one of them would have had a Pueblo right. The community acequia law of New Mexico more nearly

follows the original intent of the Mexican and Spanish laws and this Court has heretofore correctly interpreted the legal status to be given to the water rights of the Spanish and Mexican Communities or pueblos.

The New Mexico law of water rights is much more consistent and does not have the self-contradictory features of the California law. The provisions of the New Mexico Constitution pertaining to water rights are found in Article XVI. Section 1 provides:

"All existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."

Section 2 provides:

"The unappropriated water of every natural stream, penennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right."

Section 3 provides:

"Beneficial use shall be the basis, the measure and the limit of the right to the use of water."

These sections of the constitution are clear and unambiguous. The constitutional provisions cannot give comfort to the appellee's contention that the town of Las Vegas could reserve water for use some time in the indefinite future. The constitution did not make any exception for the benefit of municipalities.

Under the constitution, the unappropriated waters belong to the public and were subject to appropriation.

These same provisions were carried forward into the statutes. §§ 75–1–1, 75–1–2, N.M.S.A.1953. The latter section provides that there must be a diligent prosecution and completion of the works for the application of water to beneficial use. As in the constitution, there is no provision for a municipality to reserve water rights for a period of over one hundred years before the rights are applied to beneficial use.

The case of New Mexico Products Company v. New Mexico Power Company, supra, is in line with the constitution, statutes, customs and usages and the compacts heretofore discussed. In this case, this Court held that there was no grant to the Villa de Santa Fe, relying upon the case of United States v. City of Santa Fe, 165 U.S. 675, 17 S.Ct. 472, 41 L.Ed. 874. This case showed a definite refusal on the part of this Court at that time to follow the California decisions on this point, since the basic decision, involving the pueblo of San Francisco, was the case of Hart v. Burnett, 1860, 15 Cal. 530, where the California Supreme Court laid down the rule that the grant would be presumed. This presumption of a grant was followed in the cases involving the city of San Diego. Certain-

ly, if the interpretation by the California Supreme Court of the Plan of Pitic were adopted by this Court, since the Plan of Pitic gave the same rights to all pueblos whether chartered by the King of Spain or not, then the New Mexico Products Company case would have had a different result.

The only mention of a grant of water rights made by appellee to support its claim for Las Vegas is found in the Plan of Pitic. It is inconceivable that the Mexican government would grant such an extraordinary right to the pueblo of Las Vegas while denying the same right to the Villa de Santa Fe. Common justice and decency would prevent such discrimination. The answer, of course, is simple: The ·Plan of Pitic did not grant such extraordinary water right to Las Vegas, California decisions to the contrary.

This Court, in the New Mexico Products case, stated [42 N.M. 311, 77 P. 637]: "We find it convenient to consider only the last proposition," that is, the proposition as to whether a grant had ever been conferred upon the Villa de Santa Fe. This writer believes that if this Court had at that time found it necessary, it would have agreed with the appellant in the New Mexico Products case that the later California cases are without precedent in Spanish law and Mexican law, and that our constitution and laws, beginning with the act of 1851, are in conflict with the pueblo rights doc-

trine as interpreted by the California Courts and evidence a policy contrary to that doctrine as so interpreted.

For the many reasons hereinabove set out it is the opinion of this writer that the judgment of the lower court should be reversed and the case remanded to the lower court with direction to determine the rights of the parties in accordance with the federal court water adjudication of the Pecos Stream System in the Hope Community Case and Decree, except, of course, and in so far as the parties may have acquired additional rights by purchase or other acquisition or by prescription if recognizable in this state, or otherwise, since the entry of the Hope Decree; and except, of course, and in so far as the parties may have lost prior existing rights since the entry of the Hope Decree.

The majority entertaining views different from those of the writer, this writer therefore dissents.

McGHEE, J., concurs.

Order Denying Motion for Rehearing.

SADLER, Justice.

The plaintiffs (appellants) have moved for rehearing and the matter came on before us for oral argument participated in by opposing counsel and amici curiae appointed by the Court. We have given the same due and careful consideration and it

is our considered judgment that the motion does not state adequate grounds to sustain an order granting rehearing.

It is, therefore, the judgment of the Court that the Motion for Rehearing should be and the same is hereby denied.

It is so ordered.

LUJAN, C. J., and COMPTON, J., concur.

McGHEE J., and FEDERICI, District Judge, dissent.

FEDERICI, District Judge (dissenting on Motion for Rehearing).

The motion for rehearing should have been granted.

This writer has in no way changed his views as set out in his dissenting opinion to the original opinion of the majority, both majority and minority opinions having heretofore been filed herein. That dissenting opinion is being here supplemented after the majority entered its order denying motion for rehearing.

This writer will attempt to follow Rule 18 of this Court, and not renew views previously stated in the original dissenting opinion except as may be absolutely necessary to make this opinion speak intelligibly. This writer will primarily invoke earlier decisions of this Court and other courts deemed controlling and previously over-looked and not expressly passed upon by either the original majority or dissenting opinions.

The most fatal error appearing in the majority opinion is its statement as follows:

"We see nothing in the theory of Pueblo Rights *inconsistent* with the doctrine of prior appropriation and beneficial use. The Town of Las Vegas was granted a water right by the Mexican government in 1835." (Emphasis of Writer.)

What does prior appropriation mean? What is meant by beneficial use? Can the term "first in time, first in right" be defined? What has this Court said about defining prior appropriation? In Carlsbad Irr. Dist. v. Ford, 46 N.M. 335, 340, 128 P.2d 1047, this Court, speaking through Justice Bickley, adopted the definition of the term "appropriation of water" from Kinney, Irrigation and Water Rights, 2d Ed., § 707, as follows:

"Therefore, we believe that the following definition of the term 'appropriation of water' under the Arid Region Doctrine of Appropriation comes nearer being correct than any which we have found; the appropriation of water consists of the taking or diversion of it from some natural stream or other source of water supply, *in accordance with law*, with the *intent* to apply it to some *beneficial use or purpose*, and *consummated*, *within a rea-*

*sonable time,* by the *actual application* of all of the water *to the use designed,* or to some other *useful purpose."* (Emphasis of Writer).

How can the theory of pueblo rights be considered consistent with the doctrine of prior appropriation with the language of this Court describing the doctrine of appropriation requiring an intent to apply it to some beneficial use or purpose and consummated within a reasonable time by the actual application of all of the water to the use defined or to some other useful purpose? Kinney and this Court were talking about the Arid Region Doctrine of Appropriation, the same thing that the majority is talking about when they say:

> "We see nothing in the theory of pueblo rights inconsistent with the doctrine of prior appropriation and beneficial use."

How about the words and phrases: *intent, consummated, reasonable time, the use defined?*

At the time of the grant to Nuestra Senora de Las Dolores de Las Vegas, where was the intent to take all of the water of the Gallinas River and store it in Bradner dam to be used at the convenience of the corporation? Is a hundred years a reasonable time for the actual application of all of the water of the Gallinas River? The reasons that the doctrine of prior appropriation was adopted in all of the western states except California were twofold. First, to utilize scarce water, and second to prohibit the monopoly inherent in the riparian doctrine.

The majority opinion represents the first time that any court of the western states following the doctrine of prior appropriation has said that it is prior use to allow waters to go unused for a hundred years. Under the doctrine of prior appropriation, even before the Water Code of 1907, an appropriator must use diligence to apply the water to beneficial use or a subsequent appropriator could acquire a right to its use.

This Court said in 1900 in the case of Millheiser v. Long, 10 N.M. 99, 104, 61 P. 111, 112:

> "Diversion is one of the several elements necessary to a legal appropriation of water, and, while a valid appropriation may follow immediately upon the diversion of water from a stream by reason of a concurrence of the other necessary elements, it is still but an element of that appropriation, and is not equivalent to it. Water may be diverted from a stream, and still not be appropriated. *It is only when diversion is accompanied or followed by application to some beneficial purpose that the water is appropriated so as to prevent a subsequent appropriator from acquiring a right to its use. * * *"* (Emphasis of Writer.)

This is an earlier decision deemed controlling and previously overlooked.

Even though the pueblo of Las Vegas had a water right by virtue of the grant of April 6, 1835, it did not divert and apply the water to some beneficial purpose so as to prevent the appropriation of waters of the Gallinas River by the appellants in this action. It must be remembered that the appellants appropriated, diverted and applied to beneficial use the water which they claim more than one hundred years ago. The Millheiser case has always been the law of New Mexico. Under the Arid River Doctrine of appropriation, the intent of the claimant must coincide with the diversion and use of water. See Harkey v. Smith, 1926, 31 N. M. 521, 525, 247 P. 550; Snow v. Abalos, 1914, 18 N.M. 681, 694, 140 P. 1044.

This Court said as late as 1947, in the case of State ex rel. State Game Commission v. Red River Valley Company, 51 N.M. 207, 224, 182 P.2d 421, 432:

"* * * It is all yet public water until it is beneficially applied to the purposes for which its presence affords a potential use; * * *

"* * * These waters are not appropriated until application to use has been effected. * * *"

Later in the Red River case, this Court quoted with approval from Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N.M. 177, 61 P. 357, and stated:

"The doctrine of the Common Law as to the private ownership of the water of public streams no longer exists in this Territory or the mountain states * * * *and no longer can there be such a thing as private ownership of the water of public streams in this Territory.*" (Emphasis of Writer.)

The majority opinion is saying that the Town of Las Vegas and the Utility Company have private ownership of all of the waters of the Gallinas River and that the appellants only have a right by sufferance at their pleasure; that the corporation by virtue of the grant from Mexico, and the pueblo of Las Vegas own this entire river without regard to beneficial use and without regard to any other rights. In fact, the corporation is the private owner of the water. The majority opinion is further saying that the state engineer cannot regulate the use of water and neither could the federal court, and they are not regulated by the legislature or the Constitution of the state. What the majority is saying actually amounts to asserting that the corporation owns the water in fee simple absolute; that their claim is much stronger than the theory of private ownership of water under the riparian rights doctrine, for if they were riparian owners under the common law, the water would have to be shared with other riparians. The majority is saying there is no public ownership of water here—it is private owner-

ship by private corporation for private profits.

The majority is saying the corporation cannot come under the doctrine of relation as promulgated by this Court in one of the earliest water cases, Keeney v. Carrillo, 1883, 2 N.M. 480. Nor does it follow the latter statement by this Court in the case of Rio Puerco Irrigation Company v. Jastro, 1914, 19 N.M. 149, 153, 141 P. 874, 876, where this Court said:

"The doctrine of relation has been universally applied by the courts, in arid states, in the appropriation of water. Where notice is required by statute of the intention to appropriate, the right relates back to the time such notice is given, * * * in the absence of a statute, requiring notice, or other act, the right relates back to the time when the first step was taken. This doctrine does not apply, or protect the intending appropriator, however, unless he prosecutes his work of diversion with reasonable diligence."

This statement by this Court was merely following the language of the 1907 water law, § 75-1-2, N.M.S.A.1953. But even just as important, the 1907 water law followed this Court's pronouncement as to what is appropriation and use of water, in an unbroken line of decisions consistently defining appropriation, beneficial use and doctrine of relation from 1883 until the present time. This one section is the correct codification and summary of the doctrine of appropriation:

"*Beneficial use shall be the basis, the measure and the limit of the right to the use of water,* * * *. Priority in time shall give the better right. In all cases of claims to the use of water initiated prior to March 19, 1907, the right shall relate back to the initiation of the claim, upon the *diligent prosecution* to completion of the necessary surveys and construction for the application of the water to a beneficial use. * * *" (Emphasis of Writer.)

Diligence, intent, beneficial use are inherent in the doctrine of prior appropriation as shown by art. XVI of the Constitution of New Mexico, and by the decisions of this Court. Touching upon the necessary intent, this Court said in State ex rel. Community Ditches v. Tularosa Community Ditch, 1914, 19 N.M. 352, 371, 143 P. 207, 214:

"* * * But where such appropriator, for illustration, only originally intended to irrigate 40 acres of land, and he applied water on such land, this 40 acres of land would be the limit of his right as such appropriator under his original appropriation. * * *"

It was pointed out in Albuquerque Land & Irrigation Company v. Gutierrez, 10 N.

M. 177, 61 P. 357, supra, there is no such thing as private ownership in the waters of public streams while so flowing. The appropriator acquires only the right to take from the stream a given quantity of water for a specified purpose, Snow v. Abalos, 18 N.M. 681, 140 P. 1044, supra. Many times this Court has held that the priority of right is based upon the intent to take a specified amount of water for a specified purpose and he can only acquire a perfected right to so much water as he applied to beneficial use. See, also, Harkey v. Smith, 1926, 31 N.M. 521, 531, 247 P. 550, 553, where this Court stated:

"* * * no 'dog in the manger' policy can be allowed in this state, unless these waters can be and are beneficially used by plaintiffs, the defendants or others may use the same."

This same ideal was expressed by the federal courts in the cases of Murphy v. Kerr, D.C.D.N.Mex.1923, 296 F. 536; Hinderlider v. La Plata River & Cherry Creek Ditch Co., 1938, 304 U.S. 92, 98, 58 S.Ct. 803, 82 L.Ed. 1202.

Further, if the theory of pueblo rights is a part of the doctrine of prior appropriation, then there is no need to invoke the California doctrine. Even the California court in Lux v. Haggin, 69 Cal. 255, 4 P. 919; 10 P. 674, was careful in not designating the "pueblo rights doctrine" as part of the doctrine of prior appropriation.

If the theory of pueblo rights is consistent with the doctrine of prior appropriation, then New Mexico Products Co. v. New Mexico Power Co., 1937, 1938, 42 N. M. 311, 77 P.2d 634, is wrong and the majority has overruled the New Mexico Products Company case without so stating in their opinion.

The theory of pueblo rights, as construed by the majority here and by the California courts, is as antithetical to the doctrine of prior appropriation as day is to night.

Another fatal error in the majority opinion is the factual basis upon which it bottoms its reason for applying the pueblo rights doctrine, namely the colonization of unoccupied lands and territories. As pointed out in the works by Weil and Kinney in the prior dissenting opinion of this writer, these eminent authorities pointed out first, that pueblo rights in California were asserted not against rights acquired by *prior appropriation* but rather were asserted against *riparian rights*. Secondly, these writers in their excellent works on western water rights made it plain that the application of the pueblo rights doctrine was established by the governments of Spain and Mexico as colonization plans for *unoccupied areas in which the Pueblo that was created by grant from the sovereign was the factual basis for the original influx of settlers and squatters into the new virgin territory*. To this extent only have these

eminent writers (Weil & Kinney) searched and set out in their early writings the extent and the basis of the pueblo rights doctrine of Spain and Mexico. The fatal factual error above mentioned, and which is vital to the determination of the issue of pueblo rights, appears in the majority opinion in the following language:

"* * * A new, undeveloped and *unoccupied territory* was being settled. There were no questions of *priority* of use when a colonization pueblo was established *because there were no such users.*" (Emphasis of Writer.)

In the prior dissenting opinion this writer tried to point out this fatal factual error. The facts in this case and history itself show there were settlers on the Gallinas River long before the grant to the Pueblo de Nuestra Senora de Las Dolores de Las Vegas. And, although this error was pointed out in the prior dissent of this writer, and notwithstanding this error was forcibly pointed out to this Court in the briefs and oral arguments on motion for rehearing, yet notwithstanding all this, the majority has not corrected this fatal factual error not supported by the evidence in this case nor supported by history. The reason of course is obvious—because if the above quoted factual conclusion is deleted from the majority opinion then it would follow as day follows the night that thereby would also be deleted from this case the pueblo rights doctrine itself, as pronounced by the very authorities cited by the majority in support of the conclusion reached in holding that the pueblo rights theory applies in the case at bar. (See original dissenting opinion in this case). In addition to what was stated by this writer in his original dissent, this writer finds himself compelled to add the following with respect to this erroneous assumption of fact on the part of the majority.

The above quoted statement in the majority opinion is not supported by the evidence and, as a matter of fact, is contrary to historical fact. In 1835 New Mexico was not unoccupied territory. This state has been continuously occupied by Spanish and Mexican settlers for more than 400 years. At the time of the Coronado expedition, more than 400 years ago, this state was then occupied by Indians, many of which had a high degree of culture and the pueblos particularly had well organized governments.

Archaeologists tell us that in the Gila Valley of Arizona and New Mexico are the ruins of the Hohokam people. Those ruins show that a thousand years ago these people had achieved an advanced civilization through the wide use of water. By patient plodding labor, they built elaborate canals up to 25 miles long, irrigating more land than any other people on the American continent at that time. Nadeau, The Water Seekers, p. 3, Doubleday & Co., Inc. (1950). When Coronado explored New Mexico, he

found pueblos where irrigation was the fundamental source of life among all of the pueblo people of New Mexico. It certainly appears from the record that there were prior settlers on the Gallinas River with older and prior rights. The above are historical facts so commonly known that this Court can and should take judicial knowledge of them.

It might be asked why resort to the writings of mere historians? Let us not, however, be completely blind. Let us merely turn back the pages of our own New Mexico Reports—yes, let us look into the archives of this very Court and what do we find? We find the case of Waddingham v. Robledo in 6 N.M. 347, 28 P. 663, 667, decided January 6, 1892. In that case this Court confirmed the findings of fact made by the Special Master, as follows:

"* * * 'On the 28th of June 1819, the governor of New Mexico, then a province of Old Mexico, granted to one Antonio Ortiz a large tract of land on the Gallinas river, in San Miguel county. * * * It also appears that Antonio Ortiz, the original grantee, occupied the land under the grant for a number of years, keeping his cattle and other live-stock there, claiming it as his own, and it being generally recognized as his property,—'the sitio of Antonio Ortiz'."

This case, a creature of this Court, is judicial authority that there were Mexican settlers upon the Gallinas River at least 16 years prior to the grant to the Pueblo de Nuestra Senora de Las Dolores de Las Vegas and is conclusive reason that the doctrine of pueblo rights cannot be justified by historical or other facts in the case at bar.

It is beyond comprehension how the majority, after motion for rehearing and briefs and oral arguments on rehearing, can permit to remain in the majority opinion language that in the application of the doctrine of pueblo rights there are no questions of *priority because there were no water users* in the *unoccupied* territory *prior* to the colonization pueblo. This writer does not quarrel with the language used. That is the very basis for the application of the pueblo rights theory even where it has been declared applicable in California and as discussed by Kinney and Weil. But where, oh where, are the facts in this case establishing that the Pueblo de Nuestra Senora de Las Dolores de Las Vegas was established as a "colonization pueblo" on the Gallinas River in San Miguel County at a time when it was "unoccupied territory" and at a time when "there were no * * * users" of the waters of the Gallinas River "prior" to the establishment of the "colonization Pueblo" de Nuestra Senora? Actually the contrary is established by the only facts in this case and by the undisputed historical and judicial recordings mentioned

above and in the first dissenting opinion of this writer.

Finally the majority opinion states as follows with reference to the Treaty of Guadalupe Hidalgo, 9 Stat. 922:

> "It is urged upon us by counsel for the plaintiffs that the Las Vegas Grant is not within the portion of New Mexico protected by the Treaty of Guadalupe Hidalgo, being originally a part of the State or Republic of Texas. *The trial court properly rejected this contention.*" (Emphasis of Writer.)

What the majority is saying is that in rejecting appellants' contention they, of necessity, are holding that appellees are entitled to the protection of the Treaty of Guadalupe Hidalgo, appearing in Article VIII thereof, wherein Mexico and the United States agreed as follows:

> "In the said territories, property of every kind, now belonging to Mexicans [*now*] established there, shall be inviolably respected."

Assuming that the Town of Las Vegas had a pueblo water right as is claimed by the appellees such right was inchoate at the time New Mexico was organized as a territory and at the time of the Treaty of Guadalupe Hidalgo.

In this writer's earlier dissenting opinion he pointed out that Los Angeles and San Diego did not establish and get their confirmation of their claimed pueblo right by the virtue of the Plan of Pitic alone, but that the California decisions were based also upon California statutes, and it was pointed out that no such statutes exist in New Mexico. However, assuming that the Mexican and Spanish Law did grant such a water right, what kind of property right was granted? Was it a vested right? This writer thinks not. Black's Law Dictionary, 3rd Ed., defines "vested rights" as:

> "Rights which have so completely and definitely accrued to or settled in a person that they are not subject to be defeated or canceled by the act of any other private person, and which it is right and equitable that the government should recognize and protect, as being lawful in themselves, and settled according to the then current rules of law, and of which the individual could not be deprived arbitrarily without injustice, or of which he could not justly be deprived otherwise than by the established methods of procedure and for the public welfare. * * * (Citations omitted). A right is not 'vested' unless it is more than a mere expectation based on the anticipated continuance of present laws; it must be an established interest in property, not open to doubt. * * * (Citations omitted). To be vested in its accurate legal sense, a right must be complete and consummated, and one of which the person to whom it belongs

cannot be divested without his consent. * * * (Citations omitted). Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant, when they depend upon the continued existence of the present conditions of things until the happening of some future event. They are contingent when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting. * * * (Citations omitted)."

Black's Law Dictionary, 3rd Ed., defines "vest" as:

"To accrue to; to be fixed; to take effect; to give a fixed and indefeasible right. * * *"

"Vested" means:

"Fixed; accrued; settled, absolute. * * * (Citations omitted). Having the character or giving the rights of absolute ownership; not contingent; not subject to be defeated by a condition precedent. * * * (Citations omitted)."

Therefore, under no situation would the pueblo grant give the Town of Las Vegas a vested right to the water now claimed by the Public Service Company of New Mexico. The right was not defined, it was not fixed and the extent of the right can never be fixed until the Town of Las Vegas reaches the absolute ultimate of its growth.

The most that the grant gave the Town of Las Vegas was an expectant or contingent right and such grant was based upon the existing laws of Mexico. Such unvested rights do not have to be recognized by the State of New Mexico or by the United States Government. Neither International Law nor the Treaty of Guadalupe Hidalgo require that New Mexico recognize rights that have not vested, that are contingent or expectant. Any analysis of the right of the pueblo of Las Vegas de Nuestra Senora de Las Dolores in 1835 would show that it was a mere inchoate right. No water right becomes vested until it has been applied to beneficial use to the full extent of its right. Until the water was applied to its full beneficial use the right itself was inchoate. What then is the status of these inchoate rights? This question has been answered by this Court in the case of Grant v. Jaramillo, 6 N.M. 313, 317, 28 P. 508, where this Court quoted with approval from the United States Supreme Court case of Dent v. Emmeger, 14 Wall. 308, 20 L.Ed. 838, as follows:

"Titles which were perfect before the cession of the territory to the United States continued so afterward, and were in nowise affected by the change of sovereignty. The treaty so provided, and such would have been the effect of the principles of the law of

nations if the treaty had contained no provision upon the subject. According to that code, a change of government is never permitted to affect pre-existing rights of private property. Perfect titles are as valid under the new government as they were under its predecessor. But *inchoate rights*, such as those of Cerre, were of *imperfect obligation*, and affected only the *conscience of the new sovereign.* They were not of such a nature (until that sovereign gave them a vitality and efficacy which they did not before possess) that a court of law or equity could recognize or enforce them. When confirmed by congress, they became *American titles*, and took their legal validity wholly from the act of confirmation, *and not from any* French or *Spanish element which entered into their previous existence.* The doctrine of senior and junior equities and of *relation back* has no application in the jurisprudence of such cases. The elder confirmee has always a better right than the junior, *without reference to the date of the origin of their respective claims, or the circumstances attending it.*" (Emphasis of writer).

If the above quotation is the law of New Mexico as this Court has held that it is, then the date of the pueblo grant or the circumstances, that is the Plan of Pitic attending the corporation's claim, has no bearing upon the rights of the appellants. The appellants' rights vested before the rights of the appellees. This has been confirmed by the federal court in the Hope Community Decree case. The Court went on to hold in Grant v. Jaramillo, supra, that a court has no jurisdiction to try the question of title of a person claiming under the laws of a foreign sovereign, until the claimant can show that he had a *complete and perfect* title from the previous sovereign. The case of Grant v. Jaramillo, supra, was based upon the claim by the plaintiff-in-error in that case that under the laws of Mexico, he had a right by prescription to the lands in question. The defendant-in-error based his claim by virtue of a patent from the United States. The Court held that the plaintiff-in-error's right was a *mere inchoate right* and could not be enforced by the courts of the United States. The Supreme Court in Grant v. Jaramillo, supra, pointed out that whatever equity the plaintiff-in-error may have had, it was for the consideration and decision of Congress and not for the Court; that the remedy rested with the *political department* of the government and *not* the *judicial.*

The case of Grant v. Jaramillo, supra, was quoted with approval by this Court in the case of Waddingham v. Robledo, supra, where this Court again stated that parties relying upon inchoate grants from Mexico can have no standing in this Court

.and citing six cases from the United States Supreme Court and the earlier New Mexico case of Chaves v. Whitney, 4 N.M. (Gild) 611, 16 P. 608.

Another case dealing with inchoate rights is that of Lockhart v. Wills, 9 N.M. 344, 54 P. 336. This case involved a dispute over mining claims. The plaintiff claimed that since the premises in controversy were located within the boundaries of a claimed Mexican or Spanish grant that the ordinary rules governing the right to possession of mining claims upon the lands belonging to the United States did not obtain. The court held that since the rights were inchoate the case must be determined upon principles applicable to ordinary contests for possession of mining claims upon the public domain under the laws of the United States and of the Territory of New Mexico, and that therefore the case must be resolved under *statutes promulgated by the territory*.

It is the opinion of this writer that the above authorities are controlling here and that as far as inchoate rights deriving from Mexican law are concerned, it is up to the sovereign, that is the legislature, to validate such rights later if, in its opinion, such rights should be validated, a situation non-existing here.

. The question of inchoate rights, as far as water rights are concerned, has been discussed by the Colorado Court in the case of Taussig v. Moffat Tunnel Water & Development Co., 1904, 106 Colo. 384, 106 P.2d 363, 364, 367. Under the Colorado law, water rights are administered by the courts and an appropriator can get a conditional decree and a final decree. The conditional decree is similar to the permit system in New Mexico under the 1907 water code. In discussing an appropriative right versus an inchoate right, the Colorado Supreme Court in the above case stated:

"It next is contended that an appropriation must be for specific water and for a designated and definite purpose. That is true as to final decrees, but here we are concerned solely with conditional decrees. As already stated, such a requisite, under the circumstances, would deny to the water company its right to apply water to a beneficial use. No such statutory requirement exists as to conditional decrees, except the fixing of the maximum amount of water to be diverted, which was done in the instant case. So long as no water has been applied to beneficial use, we are concerned only with an inchoate and an unperfected right. *When the water is beneficially applied to a designated use, it becomes a property right and the decree then must take on the elements of definiteness and certainty.*" (Emphasis of Writer.)

It can be seen then that under the Colorado theory of appropriation the property

right does not vest until a specific amount of water has been beneficially applied for a designated and definite purpose. The water right acquired by the pueblo in this case was inchoate at the time that the United States assumed jurisdiction over Las Vegas.

The protection and effect to be given such inchoate rights was a matter left to the conscience of the sovereign. When Congress confirmed the Las Vegas grant, it made no grant of any sort or description concerning the water right. As pointed out in the original dissenting opinion of this writer it was just a relinquishment or quitclaim by the United States. Neither Congress nor the legislature has confirmed or validated any inchoate water right of the Town of Las Vegas, if it has one at all.

As a matter of fact, Congress, prior to the issuance of a patent to the Town of Las Vegas on June 27, 1903 (Tr. 134) had already, by virtue of the Desert Land Act (Act of March 3, 1877, 19 Stat. 377, 43 U.S.C.A. § 321 et seq.), relinquished jurisdiction over public water to the states. This is clear from the case of State ex rel. Bliss v. Dority, 55 N.M. 12, 22, 225 P.2d 1007, 1013, where this Court quoted with approval from the United States Supreme Court case of California-Oregon Power Company v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 726, 79 L.Ed. 1356:

"* * * What we hold is that following the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, *subject to the plenary control of the designated states* including those since created out of the territories named, *with the right in each to determine for itself* to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,' * * * *the full power of choice must remain with the state.*" (Emphasis of writer.)

Therefore, it is clear that the conscience of the sovereign, the United States of America, was not prevailed upon to perfect or confirm any inchoate right the Town of Las Vegas might have had by virtue of the so-called Plan of Pitic. Congress did delegate such powers to the legislature of the territory and later the State of New Mexico.

The State of New Mexico has never confirmed any inchoate water rights acquired under the laws of Mexico or Spain. 20A Words and Phrases 97, defines an inchoate right as follows:

"An 'inchoate right' as distinguished from 'vested right' is that which is not yet completed or finished."

Any water right acquired by the pueblo grant shows that it is in truth and in fact an inchoate rather than a vested right. The authorities show that the Treaty of Guadalupe Hidalgo and the rules of International Law and comity do not require confirmation of such inchoate right. The weight of authority holds that the courts do not have the power to construe such inchoate rights but it must be left to the conscience of the sovereign. In this case the legislature of New Mexico has never granted nor confirmed any pueblo rights.

This important matter of inchoate rights urged on motion for rehearing in the briefs and oral arguments should be passed upon by this Court. Only a passing reference to it was made by this writer in his original dissenting opinion. It invokes earlier decisions of this Court which to this writer are deemed controlling and which have been completely overlooked and not passed upon by the majority.

The Town of Las Vegas, *at the very most,* acquired an *inchoate* pueblo right under the Plan of Pitic and the Mexican grant to the Pueblo de Nuestra Senora de Las Dolores de Las Vegas. This inchoate right was not confirmed by the Treaty of Guadalupe Hidalgo. This right was not confirmed by the Congress of the United States. It has not been confirmed or validated by either the legislatures of the Territory of New Mexico or of the State of New Mexico. This alleged pueblo right has not been confirmed to this day by the political department of any sovereign of this country, Federal, Territorial, or State. For the first time it is being confirmed and validated by the majority opinion in this case. This is judicial legislation.

Considering the separation of powers of this state, art. III, Section 1, New Mexico Constitution, the legislature makes the laws, the executive executes them and the judiciary construes them. State v. Fifth Judicial Dist. Court, 36 N.M. 151, 9 P.2d 691; Kelley v. Marron, 21 N.M. 239, 153, P. 262. It is the legislature that establishes the police power and the public policy of New Mexico, and the legislature has established the public policy of New Mexico to follow the doctrine of appropriation. It could not have done otherwise due to the express provisions of Article XVI of the New Mexico Constitution.

When the appellants appropriated the waters of the Gallinas, that water which they appropriated was unappropriated water. Section 1 of Article XVI, New Mexico Constitution, states:

"All existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."

The community of Las Vegas at the time of the adoption of the Constitution was not using the water claimed by the appellants; it was being used by the appel-

lants and was confirmed and recognized by the Constitution.

This writer repeats that wherein the majority opinion speaks of lex suprema, the police power, public policy and public good in upholding the pueblo rights doctrine in this case, to that extent the majority is going beyond the scope of the judicial branch of our state government and encroaches upon the legislative.

The only water rights that have been perfected on the Gallinas River in so far as they apply to the appellees herein are as set out in the water adjudication of the Pecos Stream System in the federal court Hope Decree, and as later confirmed by order of the State Engineer of February 8, 1950, granting the appellee Public Service Company of New Mexico the privilege of constructing and maintaining the Bradner Dam for the storage of 2600 acre feet of water per annum, with an 1881 priority based on the Hope Decree.

The motion for rehearing should be granted and upon rehearing the judgment of the lower court should be reversed and the case remanded to the lower court with appropriate directions from this Court.

The majority entertaining views different from those of this writer, this writer therefore reaffirms his original dissent from the original opinion of the majority; and now dissents from the ruling of the majority denying the motion for rehearing.

McGHEE, J., concurs.

On Motions For Second Rehearing, Five Judge Court and To Recall Mandate.

LUJAN, Chief Justice.

This cause coming on to be heard on the second motion for rehearing, motion to recall the mandate and motion for a five-judge court, Chief Justice LUJAN, Justice McGHEE and Justice COMPTON and District Judge FEDERICI sitting, and the court having considered the briefs of counsel and being well and sufficiently advised in the premises, presents a division of opinion as follows: Justice McGHEE and District Judge FEDERICI remain of the same opinion expressed in their dissent from the original opinion and think the above mentioned motions should be granted; Chief Justice LUJAN and Justice COMPTON think the opinion on file should stand as written, thus adhering to the views entertained by them at the time they expressed their concurrence by signing the same and that the above motions should be denied.

Wherefore, it thus appearing that a majority of the Court cannot be secured favoring the granting of the above motions, and the court being without right under the decision rendered in Flaska v. State, 51 N.

M. 13, 177 P.2d 174, to call in a justice or judge not participating in the original decision, to participate in the consideration of the above motions, the opinion heretofore filed affirming the judgment will stand, and the motions are denied by operation of law.

COMPTON, J., concurs.

On Second Motion for Rehearing.

FEDERICI, District Judge.

There are three motions before the Court: (1) a motion for leave to file a second motion for rehearing, (2) a motion to recall the mandate, and (3) a motion for review by a full five-judge Court to pass upon a jurisdictional question not heretofore presented to or ruled upon by the Court, involving the question of whether an indispensable party is lacking in this cause.

The motion for leave to file a second motion for rehearing should be granted because the motion is based on a completely new jurisdictional ground of lack of an indispensable party to this action, to wit, the Las Vegas Grant created in 1903. See § 8-6-1, N.M.S.A., providing as follows:

"The district court of San Miguel County, in the state of New Mexico, is vested with jurisdiction to manage, control and administer that land claim known as 'The Las Vegas Land Grant,' confirmed by the Act of Congress on the 21st day of June, A.D.1860 (12 Stat. 71), to the Town of Las Vegas."

Intervenor Town of Las Vegas was not yet in existence as a corporate entity on June 21, 1860, and was and is now within the exterior boundaries of the Las Vegas Grant.

It is elementary that such a jurisdictional question may be raised for the first time in this Court. See, Miller v. Klasner, 19 N.M. 21, 140 P. 1107; Hugh K. Gale Post No. 2182 V.F.W. v. Norris, 53 N.M. 58, 201 P.2d 777, and Rubalcava v. Garst, 56 N.M. 647, 248 P.2d 207. See also the exact parallel case of Ex parte Priest v. Board of Trustees of the Town of Las Vegas, 16 N. M. 692, 120 P. 894, wherein the Territorial Supreme Court of this State (apparently affirmed by the Supreme Court of the United States) held that in a prior action to quiet title a judgment there obtained attempting to quiet title to lands within the exterior boundaries of the Las Vegas Grant was void for the reason that the Town of Las Vegas had not been made a party. This was so held notwithstanding, as pointed out in the opinion, that at the time of the prior suit to quiet title in 1894 the Town of Las Vegas was a mere aggregation of people without corporate organization.

This present jurisdictional challenge is a very serious one not heretofore raised or invoked by any of the parties, nor suggested by the Court as this Court might well have suggested, and which this writer now also suggests. Leave to file a second motion for rehearing should be granted to the end that this Court formally pass on this vital

jurisdictional question which this writer deems to be of sufficient utmost importance to warrant this Court looking into the matter fully, and if found by this Court to be a good ground of jurisdictional attack would be controlling in this case. Thereupon the case would merely be sent back to the lower court with instructions to proceed further whenever any necessary indispensable party or parties will have been brought before that court, or a new action instituted with all indispensable parties in court. Leave should be granted to appellants to file a second motion for rehearing.

The motion to recall the mandate should also be granted as a corollary of and along with the granting of the motion for leave to file a second motion for rehearing.

The motion calling for a five-judge Court should be granted to determine the new jurisdictional issue of whether the Las Vegas Grant is an indispensable party to this cause, and in fact a five-judge Court should also pass upon whether the motion for leave to file a second motion for rehearing should be granted on this new and vital jurisdictional question.

The second motion for rehearing was heard in this case just a few days before the retirement of Justice SADLER from this Court. In conference after the hearing this writer announced to the other Justices that he desired to write and circulate an opinion expressing his views on the new matters urged at the rehearing and by this writer deemed controlling. It was a physical impossibility to prepare and circulate such an opinion prior to Justice SADLER'S retirement. The Justices understood that and this writer was given time to prepare his opinion. The date of rehearing was May 3 and the announced date of Justice SADLER'S retirement was May 15. This writer circulated his opinion on rehearing May 19. Prior to May 15 the majority denied the motion for rehearing and directed the clerk to issue the mandate to the lower court. The motion for rehearing was denied and mandate issued before this writer was able to circulate his views by way of his opinion to the other participating Justices.

We are now faced with the present three motions being passed upon subsequent to the retirement of Justice SADLER. Justice SADLER was succeeded by Justice MOISE who signed one of the briefs of amici curiae herein. Justice CARMODY, now presently on the bench since January 1, was not on the bench at the time the original majority and dissenting opinions were handed down and of course the same five Judges sat in the case on motion for rehearing on May 3 and of course Justice CARMODY did not participate for there already was a full Court sitting in the matter at that time. He is however a member of the Court at this time. It is the view of this writer that Justice CARMODY is eligible to sit in judgment in the present

three motions, or if he declines, it is the view of this writer that then the presently constituted four members originally hearing the case (including this writer called in as a District Judge) should call in a second District Judge to the end that this important jurisdictional question be heard by a full five-judge Court. The reasons therefor will hereinafter now be stated.

The jurisdictional issue of lack of an indispensable party is, as already pointed out, a completely new issue in this case and in the opinion of this writer is a controlling factor in the present disposition of this case. Simple fairness and justice requires that since appellants have asked for a full Court on this new phase of this litigation, a full Court should sit in judgment. This writer solicits Justice CARMODY'S participation herein, and if he should decline, this writer invites the three other Justices to join the writer in calling in another District Judge so we may have a full Court.

What this writer is suggesting in this portion of this opinion is not in conflict with the prior holdings of this Court as set out in the cases of Flaska v. State, 51 N.M. 13, 177 P.2d 174, and State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421. At this point in this opinion this writer is urging a full Court for the purpose of at least passing on a new fundamental jurisdictional question not raised before nor passed upon by the prior full Court—a matter not involved

in either the Flaska or the Red River Valley cases, supra. Certainly to this extent the case at bar differs and is distinguishable from said two prior cases. If but for this limited jurisdictional purpose this writer is of the opinion that an exception or distinction should be found to the Flaska and Red River Valley cases. Even the remaining members of the presently constituted four participating Judges should concur to at least this limited extent, if not all the way as will now be pointed out.

This writer now expresses the view that the Flaska and Red River Valley cases should now be overruled in so far as they hold that a succeeding Justice cannot participate in motions for rehearing if he was not a participating Justice in the case in which an opinion had already been filed and in which motions for rehearing were filed in the interim.

It might be argued that these holdings should not be overruled in a pending case. The answer to this argument is two-fold. First, the ruling was adopted in a pending case (Flaska case), was it not? In fact, the ruling was announced while there was actually another case pending involving the same situation, namely, the Red River Valley case, as will hereinafter be more fully pointed out. Further, the ruling in the Flaska case was announced not only while these two cases were pending, but at a time when the prior actual practice and procedure had always been to the contrary

in this Court, as will also hereinafter be more fully pointed out. Secondly, if those rulings are deemed erroneous then of necessity they must and can be overruled by judicial action of this Court only in a pending case—either this case or another case. If this Court is now of the view that the holdings of the Flaska and Red River Valley cases should be overruled, now is the proper time, to the end that litigants desiring a full Court to completion in a case shall have that right. Where can it be pointed out that this right to a full Court has been abused? If the right is to be abused obviously the right can be abused by insisting upon a four-Judge Court just as easily as insisting upon a five-Judge Court.

No better argument can be found for the reversal of the Flaska and Red River Valley cases on this point than that found in the language of Justice SADLER'S final dissenting opinion on page 281 of 51 N.M., on page 467 of 182 P.2d in State ex rel. State Game Commission v. Red River Valley Company. Justice SADLER pointed out that the Flaska ruling was erroneous:

"* * * because of a contrary practice long prevailing in this State as demonstrated by the decisions of this court on rehearing in the cases of State v. Armstrong 31 N.M. 220, 243 P. 333; Odell v. Colmor Irrigation & Land Co., 34 N.M. 277, 280 P. 398, and State v. Pate, 47 N.M. 182, 138 P.2d 1006, in each of which a judge or judges participated on rehearing as successor to some judge no longer on the court who had participated in rendering the original decision." (Emphasis of writer.)

No doubt, an exhaustive search of the New Mexico Reports will disclose many other cases, other than those mentioned by Justice SADLER, in which this practice was followed prior to the Flaska case.

It is interesting to note that the original opinion in the Red River Valley case was filed on September 24, 1945, whereas the original opinion in the Flaska case was filed more than a year later, on December 5, 1946. The first rehearing was denied in the Red River Valley Company case on March 26, 1946, and the first rehearing was denied in the Flaska case later, on December 31, 1946. Now, then, it was in the second motion for rehearing in these cases that the same situation arose about a succeeding Justice participating in a case in which a opinion had already been filed and in which a motion for rehearing had been filed in the interim. Here, interestingly, we find that although the original decision in the Red River Valley Company case had been filed more than a year prior to the original decision in the Flaska case, and although the first rehearing had been likewise first denied in the Red River Valley Company case, nevertheless, the ruling here in question on second rehearing was

filed in the Flaska case on February 19, 1947, prior to the ruling on rehearing in the Red River Valley Company case on a second rehearing which was handed down later again, on June 18, 1947.

At any rate, when the matter came up in the Red River Valley Company case this Court was then faced with the sandwiched-in ruling of the Flaska case. Not having participated, because of recusation in the Flaska case, and finding himself in the minority in the Red River Valley Company case, is it any wonder that Justice SADLER was frustratingly constrained to say in his final dissenting opinion in the Red River Valley Company case, as follows:

"Since under the Flaska decision the motion must stand denied by operation of law, it would avail nothing for two opposing minorities on the court to debate the merits of their respective views. *Suffice it to say that such an unsatisfactory ending to a case involving issues so important is to be deplored.*" (Emphasis of Writer).

History does repeat itself even under entirely different circumstances, and Justice SADLER'S words of yesteryears again reverberate an echo of nostalgia to this case.

Elaborating somewhat on Justice SADLER'S last memorable dissenting opinion in the Red River Valley Company case this writer would add to the cases on prior prevailing practice cited by Justice SADLER (and there must be many others) the case of Seaberg v. Raton Public Service Company, 43 N.M. 161, 87 P.2d 676. The original opinion was handed down in the later part of the year 1938. On that opinion the Court was divided four to one, the majority being Justices ZINN, BICKLEY, SADLER, and BRICE. The dissenter was Justice HUDSPETH. On considering the motion for rehearing the Court withdrew the original opinion and substituted a new one. This occurred February 15, 1939. In the iterim, Justice HUDSPETH'S term had expired, and Justice MABRY had taken office. The report notes that Justice HUDSPETH had dissented from the original opinion; but all five members of the Court, including Justice MABRY, the new member, joined in the final opinion.

Justice SADLER in the aforesaid dissent mentions Odell v. Colmor Irrigation & Land Company, supra. In that case the original opinion was handed down January 28, 1924. It was unanimous, joined in by Justices BRATTON, PARKER and BOTTS, the full three-judge Court as then constituted by law. On rehearing, the Court adhered to the same main result but modified it slightly. This decision on rehearing was rendered January 16, 1929. The law now provided for a five-judge Court. The four Justices participating were WATSON, PARKER, CATRON, and SIMMS. Justice BICKLEY, the remaining member of the five-man court, disqualified and did not participate. Here,

there was a lapse of time of almost five years, and Justice PARKER was the only remaining member of the Court which rendered the original decision, yet three new Justices participated with him in the final opinion on rehearing.

If the rulings in the Flaska and Red River Valley Company cases are to continue as being the law in this state, any possible set of circumstances could make them appear very ridiculous. For example, this writer recalls a short time ago that there was a Judicial Council meeting held at Taos, and in attendance there were three members of the Supreme Court, Justices McGHEE, CARMODY and MOISE. Let us suppose that they had just filed a majority opinion prior to making the trip to Taos in which Justices LUJAN and COMPTON had dissented. Let us suppose further, and God forbid, that these three eminent jurists who had been in Taos were riding back to Sante Fe together and became involved in an automobile accident resulting in the death of all three of them. Let us suppose still further that a motion for rehearing was filed, in this particular case, in which the grounds for rehearing were absolutely and without question valid, based perhaps on a controlling statute overlooked, or any number of valid reasons—something on which any lawyer or judge would agree that there had just been a mistake made. Under the holding in the Flaska and Red River Valley cases the litigants and the Court would be helpless to do anything about it because anyone succeeding these three jurists would be unable to participate, not only because the Flaska holding would not permit them, but because there would be no remaining surviving Justice who had participated in the majority to vote with the two dissenters for a rehearing. An erroneous opinion would have to remain the law of the State until it was overruled in a subsequent case.

The above hypothetical situation may sound ridiculous. It is not beyond the realm of possibility. Many another hypothesis might be surmised by most any searching soul. Suffice it to say that the one hypothetical situation mentioned graphically points out, at least to this writer, how ridiculous was and can be the result reached in the Flaska and Red River Valley cases, and these cases should be overruled on this point of practice and procedure.

On the motion that a five-judge Court hear the pending three motions before this Court it is the view of this writer that: (1) this is the time and proper case in which to overrule the Flaska and Red River Valley cases on this point; and (2) that in any event, since the matters urged on second motion for rehearing deal with an entirely new jurisdictional question, there should be a five-judge court to pass not only upon whether the jurisdictional attack is well taken, but on the question of whether leave should be granted to file a second motion for rehearing on this question. In oth-

er words, if this Court will not overrule the Flaska and Red River Valley cases it should, in this case, at least find an exception or distinction to the Flaska and Red River Valley cases for the purpose of passing on the new jurisdictional question raised.

To recapitulate as to the whole of this opinion, it is the view of this writer that all three motions now pending herein, namely, motion for leave to file second motion for rehearing, motion to recall mandate, and motion for a five-judge Court should be granted en toto.

McGHEE, J., concurs.